## THORPE v. BAMBERGER R. CO.

No. 6703. Decided November 21, 1944. (153 P. 2d 541.)

See 25 C. J. S. Damages, Sec. 199; (1) 25 Am. Jur. 548.

---

[1]*Salt Lake City* v. *Kusse,* 97 Utah 113, 93 P. 2d 671.

*Irvine, Skeen & Thurman,* of Salt Lake City, for appellant.

*Samuel C. Powell* and *Derrah B. Van Dyke,* both of Ogden, and *Fred L. Finlinson,* of Salt Lake City, for respondent.

WOLFE, Chief Justice.

Appeal from a judgment awarding $1548.50 as damages for injury to plaintiff and his car.

The action grew out of a collision occurring in the intersection of Lincoln Avenue and Twenty-fourth Street in Ogden, Utah, between an automobile owned and driven by plaintiff and one of defendant's electric railway cars. The plaintiff alleged four specifications of negligence. The only one with which we are concerned in this appeal is the alleged failure to stop before entering the intersection. Lincoln Avenue, along which defendant operates its rail line, runs north and south. Twenty-fourth street designated as a through street by the Ogden City ordinance runs east and west. The police department of Ogden City pursuant to an ordinance authorizing and directing such action had placed a "stop" sign on Lincoln Avenue just north of the boundary line of the intersection in question. The defendant contends that the "stop" sign could not apply to its cars and that if it was intended to apply to its cars it was inoperative for the reason that the city had no power to require an interurban car to stop at a through street.

Ogden City requires every operator of a vehicle, street car or other conveyance travelling upon any street intersection designated a through street to stop in obedience to a stop sign. Twenty-fourth street, as above stated, was by ordinance designated a through street. The defendant contended that the city had no power to make interurban cars amenable to this ordinance. It based its contention

on the ground that Sections 8 and 9 of Chapter 7, Title 57, R. S. U. 1933, which gave local authorities power to require operators of interurban cars to stop when so instructed by stop signals had been repealed and superseded by Chapter 52, Session Laws of 1941, which expressly excluded interurban cars from its operation.

Sections 8 and 9 of Chapter 7, Title 57, R. S. U. 1933, provided:

"57-7-8. Signs and Signals—By Local Authorities.

"Subject to such authority as may be vested in the state road commission, local authorities in their respective jurisdictions may cause appropriate signs to be erected and maintained on state highways designating business and residence districts and railway graded crossings, and such other signs, markings and traffic control signals as may be deemed necessary to direct and regulate traffic, and such additional signs as may be appropriate to give notice of local parking and other special regulations."

"57-7-9. Id. Must be Obeyed.

"It is unlawful for the driver of any vehicle or for the operator of any street or interurban car or electric trolley coach to disobey the instructions of any official traffic sign or signal placed in accordance with the provisions of law, unless otherwise directed by a police officer."

In 1941 the Utah legislature by Chapter 52, Session Laws 1941, repealed, among others, the foregoing statutory provisions and enacted a new uniform statute for the control of traffic on highways, which provisions are now found in Title 57, U. C. A. 1943. Chapter 7, Section 163 (c) of Title 57 reads as folows:

"Every driver of a *vehicle* shall stop at such sign [stop sign provided for by subsections (a) and (b) of section] or at clearly marked stop line before entering an intersection except when directed to proceed by a police officer or traffic control signal." (Italics added.)

By Sec. 57-7-78, subsection (a) a vehicle subject to the act is defined as:

"Every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power or *used exclusively upon stationary rails or tracks.*" (Italics supplied.)

In the light of the fact that subsection (a), Sec. 57-7-78 did exclude from the operation of that act vehicles used exclusively upon stationary rails and tracks, and in the further light of the fact that Sec. 57-7-9, R. S. U. 1933, which made it unlawful for operators of any street or interurban car or electric trolley coach to disobey a stop sign, was repealed and superseded by Title 57, U. C. A. 1943, it is contended that the legislature intended to withdraw from local authorities the power to require interurban cars to stop at designated through streets. The contention is not sound.

Title 57, U. C. A. 1943, pertains preponderantly to motor vehicles not confined to tracks, viz.: Automobiles and motor-cycles, and the like. It was a Uniform Act designed to regulate non-rail vehicular traffic on streets and therefore expressly excluded steam trains, trolley and interurban cars. Where it is intended in one act to deal with one class of vehicles and no other class and in order to do this it is necessary to repeal an act which dealt with all classes of vehicles, the repeal may be for the purpose of making this segregation. The repealing act incidently eliminated from the statutes legislation which dealt with another class of vehicles. Any powers formerly residing in cities which were dependent on the provisions of the repealed act were also eliminated as far as they were dependent on the repealed act. If those powers still exist in the cities, it must be by virtue of a grant of those powers made by other legislation. In this case we do find that the power to require interurban trains to stop at through streets was, by the legislature, granted to cities entirely independent of Title 57, R. S. U. 1933. Title 15 of U. C. A. 1943, deals with "Cities and Towns." It contains most of the powers granted by the legislature to cities and towns. Sec. 15-8-30 of that title reads:

"Regulation of Traffic.

"They [the Board of Commissioners and City Councils of Cities] may regulate the movement of traffic on the streets, sidewalks and public places, including the movement of pedestrians as well as of

vehicles, and the cars and engines of railroads, street railroads and tramways, and may prevent racing and immoderate driving or riding."

We think the power to regulate the movement of traffic included the power to require vehicles to stop where such stops are reasonably adapted to the scheme of handling traffic.

The repeal of Title 57 of Sections 8 and 9 of Chapter 7, Revised Statutes of 1933, by Chapter 52 of Session Laws of 1941, now found in Chapter 7 of Title 57 of U. C. A. 1943, did not expressly or by implication repeal Section 15-8-30, R. S. U. 1933, now Sec. 15-8-30 U. C. A. 1943. There is nothing inconsistent between the two statutes, nor between the ordinance and Chapter 52, Session Laws 1941. For test of conflict between ordinance and general laws, see *Salt Lake City* v. *Kusse*, 97 Utah 113, 93 P. 2d 671. Section 15-8-30 runs back to the beginning of statehood. It is unnecessary to consider respondent's contention that Sections 57-7-84 and 57-7-78 (qq) and Section 57-7-89 all in the Uniform Act Regulating Traffic on Highways contained in Title 57, U. C. A. 1943, and headed "Motor Vehicles," themselves restored to the cities the powers purportedly taken away by the repeal of Chapter 7, Title 57, R. S. U. 1933.

The appellant assigns as error the lower court's refusal to give its requested instruction No. 11. ■ The requested instruction reads as follows:

" 'If you find from the evidence that after defendant's train started to cross the intersection of Lincoln Avenue and 24th Street, plaintiff drove his automobile in the path of defendant's train within the intersection in front of such train, then you should find that plaintiff was guilty of negligence, and if you further find that such negligence proximately contributed to the collision involved in this case, then your verdict should be for the defendant and against the plaintiff, no cause of action.' "

There was no error in refusing to give this instruction. Defendant's theory of the case was that its car was first in the intersection and that therefore it had the right of

way and this regardless of whether it had or had not stopped at the stop sign. It therefore contends that its failure to stop was taken out of the case because even though it did not stop it was first in the intersection and hence put upon the plaintiff the duty to yield it the right of way. Defendant asserts that it was entitled to requested instruction No. 11 to reflect this theory of the case. Laying aside the question of whether a person who ignores a stop sign and thus enters an intersection first can claim the benefit of the right of way rule, especially in the light of the probability that there entered into the very calculations of the operator of the other car on the through street before he came to the intersection the reliance that the other would not reach the intersection first if he fulfilled his duty to stop, we do not think that the requested instruction reflects the theory which the defendant advances. The instruction which defendant probably intended to request was that if the jury found from the evidence the defendant's train entered the intersection first and then the plaintiff drove his car into the path of defendant's train, etc. But the requested instruction did not so read. It does not reflect only the situation where the plaintiff's car was last to enter the intersection but also a situation where plaintiff may have been first in the intersection and driven his car across the path of defendant's train. Certainly in order for a collision to happen plaintiff would have had to drive his car either into defendant's train or across its path "after defendant's train started to cross the intersection."

The appellant complains that there is no evidence to support a verdict of $698.50 special damages. It is contended that no greater sum than $417 should have been allowed as the damages to the automobile instead of $600 allowed by the jury. Southwick, plaintiff's witness, testified that on the date of the accident, January 20, 1943, the value of plaintiff's automobile was $500 in the condition it was when sold to him in September, 1942. Subtracting $82.50, the salvage value, plaintiff's damage for the injury to the car would be only $417.50.

The plaintiff testified that in the September previous to January 26, 1943, he had had a collision on the Brigham road and that the repair bill was $150 for labor and $150 for materials but that the car was then placed in better condition than it was before he had the collision on the Brigham road, having had a new paint job. However, there is no evidence as to how much of the $300 expended on the car after the collision on the Brigham road went into repairs caused by that collision and how much went into improvements which made it a better car than it was before that collision and hence how much more than $500 it was worth. The jury found it was worth $600 but whether $100 or more or less was devoted toward making it a better car than it was before the Brigham road collision does not appear. There is no evidence as to that. The verdict for special damages must be reduced from $698.50 to $516, and therefore the total amount from $1548.50 to $1366. The judgment is affirmed in the latter amount. Costs are awarded to the plaintiff.

LARSON, McDONOUGH, WADE, and TURNER, JJ., concur.