## UNITED STATES v. MORLEY.

### No. 6331.

Circuit Court of Appeals, Seventh Circuit.

Oct. 20, 1938.

Rehearing Denied Nov. 22, 1938.

Wm. A. Bryans, of Denver, Colo., for appellant.

Val Nolan, U. S. Atty., and B. Howard Caughran and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

The defendant, Clarence J. Morley, appeals from a judgment which pronounced a sentence upon him after conviction by jury. The indictment charged him and six others, in twenty-one counts, with violations of section 215 of the Criminal Code, 18 U.S.C.A. § 338, commonly known as the mail fraud statute. Morley was acquitted on twenty, and convicted on one count. He was sentenced to imprisonment for five years.

The indictment named seven defendants. Defendant Morley is the only one to appeal. Co-defendants Stevenson, Anderson, Chase, and Ward are serving terms in the penitentiary. Two other defendants, James and Joseph Gualano, fled and have never been apprehended.

Morley's chief complaint, here, is the alleged failure of proof to support the conviction. His other assignments of error were not pressed seriously on oral

argument, and we are convinced they are not worthy of extended consideration.

Briefly stated, the scheme to defraud revolves around the transactions of the Clarence J. Morley & Company, Inc., which was named after and organized through the activities of defendant Morley, a former governor and judge of Colorado. Undoubtedly, Morley's name was selected to inspire confidence in prospective customers and help overcome sales resistance.

An earlier corporation, Investors Shares, Inc., was organized in Colorado, and Morley was its attorney, one of its stockholders, and a director. He was associated there with those who later promoted and conducted the affairs of the Clarence J. Morley & Company, with principal offices at Indianapolis.

It appears that Morley sent Anderson from Denver to Indiana with written authority to represent him in certain transactions looking towards the establishment of offices of the new corporation which was shortly thereafter formed by promoters who were irresponsible financially and fell within the group commonly called dummy promoters and directors.

From its inception the Clarence J. Morley Company engaged in nothing but fraudulent transactions. It sought to sell and did sell to a large number of customers, securities of various kinds. At no time had it any intention of carrying out the transaction by delivery of the stock. It may be stated that the company was evilly conceived, and its transactions were iniquitous throughout. Many customers in Indiana, Ohio, and Kentucky, where it operated, lost substantial sums of money. The venture became such as to call for a raid by the authorities and the immediate absconding of some of the principals who have since remained fugitives from justice.

Defendant Morley does not question the sufficiency of the evidence to sustain a finding that a fraudulent scheme was conceived; that the mails were used in furtherance of it; that there are no extenuating circumstances which can be offered to explain the activities of said corporation and of those who had charge of its affairs. He, however, disclaims any knowledge of its fraudulent activities and of any intent to participate in the scheme to defraud.

His counsel asserts that he suffered strokes which impaired his mental vigor and understanding and that his responsibility for the fraud committed in the name of the company and through the use of his name was not only unknown to him, but he was incapable of understanding their purport or significance.

Likewise, it is claimed that he resided in Denver, Colorado, and was unaware of the bad record of Anderson, in whom he had originally entrusted the task of incorporating the Clarence J. Morley & Company; that he did not profit by or through the operations of the corporation. In short, it is claimed that he was as embarrassingly deceived by his associates as were the victims by the Clarence J. Morley & Company's activities.

We must confess that a study of the record leads to the conclusion that the case is closer than at first it seemed to be.

Notwithstanding counsel's confident assurance to the contrary, we are not satisfied, after reading defendant's testimony, that his mental faculties had been impaired to the extent of excusing him for the part he played in the organization and the promotion of this fraudulent company. His answers are intelligent, coherent, and rational—consistent with the position of one who is seeking to avoid responsibility for action of others which was little short of stealing. At no time was there any suggestion to the trial court that he lacked mental understanding. Not until oral argument was made in this court was the contention made by his counsel that he was deficient, or lacking in mental ability to understand the connivance, the cupidity, and the culpability of his associates.

Likewise, we can not accept as established the claim that Morley was not a stockholder or interested in the company that bore his name.

He made affidavits to the effect that he was president of the company. This was after he was elected president. He was a lawyer and an ex-judge and ex-governor of a state. In the absence of a denial on his part, we can not assume that he did not know that to be president of the Indiana company he needed to be a stockholder.

Nor can we ignore the inference which flows from the fact that he sent Anderson to Indiana to organize the corporation and to establish and use a bank account in the company's name. One of the co-defendants who was not apprehended was an offi-

cer of Investors Shares Co. and had been convicted of a mail fraud scheme in Colorado.

Defendants Anderson and Gualano had been closely identified, as officers, with the financial transactions of the Colorado Company of which Morley had been attorney and director. Through Anderson he caused the organization of the Indiana company, which bore his name and of which he was president. The rapidity with which said corporation commenced and continued its criminal transactions is suggestive at least that it was conceived and created for an evil purpose.

It is impossible to believe that defendant was not aware of the character and practices of his associates. The Morley company's transactions covered eleven months and extended over a territory that included Ohio, Kentucky, Illinois, and Indiana. The utter absence of honesty and integrity in any of its activities during that period is significant.

Defendant argues that the evidence shows he was guilty of neglect only and he admits that he might be liable in a civil action. He denies, however, that he was, or that the evidence showed him to be, a participant in the fraudulent scheme which the company bearing his name was organized to, and did, perpetrate.

Without discussing the evidence more in detail, we content ourselves with expressing our conclusion which is that a jury question was presented by the evidence.

More direct and persuasive evidence of defendant's participation in the scheme might have been presented. However, the record shows that the scheme was carried out by the use of the mails and telephones rather than by face to face contact with the investors. Likewise, some of the operators absconded and this avenue to evidence was thereby closed. It was, thus, impossible to identify individual defendants and connect them with individual sales. Moreover, certain co-defendants on the trial relied upon their constitutional rights and refused to take the stand.

■ Of course, difficulty in securing evidence affords no answer to the argument that the defendant may not be validly convicted unless there is a decided preponderance of evidence to support every essential element of the crime charged. The burden is on the Government to prove defendant's guilt beyond a reasonable doubt. It can not be shifted. The proof of the existence of the scheme to defraud, however strong, is insufficient, standing alone. Use of the mail to further the scheme is also essential and finally it must be shown and by competent proof that the accused knowingly participated in the crime. The Government's case must stand on the facts it has established, and the legitimate inferences that are deducible from such proven facts. It can not rest, where there is a failure of proof of guilt, upon the weakness of the accused's status or the embarrassing position he finds himself in.

■ On the other hand, let it be said, defendant has not necessarily established a case for a directed verdict in his favor by professing innocence and denying the existence of criminal intent. If the established facts and inescapable inferences are inconsistent with the accused's professions of innocence, it becomes the problem of the jury to weigh the evidence and determine, under proper instructions dealing with quantum of proof necessary to convict, the guilt or innocence of the accused.

■ The existence of guilty knowledge and the presence of a criminal intent are not matters provable with the certainty that facts may be established by documentary proof. No X-ray picture will reproduce and reflect the state of the accused's mind. Only by weighing the acts of the accused against his professions of innocence when they are inconsistent, can the fact finding body reach an intelligent verdict or finding. If the accused's acts and assurances are reconcilable, then no jury question is presented and the defendant should be dismissed. If, however, there be irreconcilability—if the acts of the accused dispute his assurances of innocence and the conflict is vital, then the court must let the jury weigh the conflicting evidence and decide.

■ The case before us falls within the latter class. The facts required the submission of the case to the jury.

The judgment is affirmed.