## STATE v. THATCHER

No. 6710. Decided March 29, 1945. (157 P. 2d 258.)

64

See 23 C. J. S. Criminal Law, Sec. 1138. Homicide in connection with operation of automobile, notes, 16 A. L. R. 914; 21 A. L. R. 1504; 27 A. L. R. 1182; 30 A. L. R. 66; 41 A. L. R. 725; 42 A. L. R. 1120; 46 A. L. R. 1060; 49 A. L. R. 608; 53 A. L. R. 254; 59 A. L. R. 695; 99 A. L. R. 756; See, also, 26 Am. Jur. 301.

*Grover A. Giles,* Atty. Gen., and *Arthur H. Nielsen,* Asst. Atty. Gen., for appellant.

*George W. Worthen* and *George S. Ballif,* both of Provo, for respondent.

COWLEY, District Judge.

Defendant, George Alma Thatcher, was prosecuted in the District Court of Utah County on a charge of involuntary manslaughter. At the conclusion of the State's case defendant's motion for dismissal was granted and the defendant was discharged. From this judgment of dismissal the State appeals.

This case arose out of an accident which occurred on the 8th day of August, 1943, in Utah County. The defendant was driving· his automobile in a southerly direction on Highway 91 within the corporate limits of Orem City when he ran into a group of pedestrians, killing two of them, a soldier by the name of Sergeant David Bornstein and a young lady by the name of Norma Thompson. The death of Norma Thompson is the basis of this case.

The accident occurred about 200 feet north of 4th North in Orem City on said Highway 91. Highway 91 in this vicinity runs in a general southeasterly and northwesterly direction. Fourth North intersects Highway 91 at right angles. Highway 91 is a concrete highway 26 feet wide, 13 feet on either side of the center line. A tar line separates the outer four feet of said highway on either side which is a new addition to the original highway. On the early morning of August 8, 1943 at about 1:10 a. m. two highway patrolmen driving west on Canyon Road came to a stop at the stop sign where Canyon Road intersects Highway 91. Canyon Road is a little more than one-half mile north of 4th North. As the highway patrolmen brought their car to a stop at the stop sign they noticed a car to their right traveling south on said Highway 91 at a rate of speed which they thought was excessive. The patrolmen therefore turned south on said highway in pursuit of this car, and

when they believed they had succeeded in pacing the car without gaining or losing, the patrolmen clocked the car at 60 miles per hour. During this time the first car was traveling in a straight line with its right wheels following the tar line which separates the new concrete four-foot strip from the old nine-foot concrete lane on the west side of the center line.

Immediately after this car had been clocked it commenced veering to the right and when said car was approximately even with the Stratton Fruit Stand, (which is about 200 feet north of 4th North) it ran into a crowd of five pedestrians who were approximately from one to four feet west of the west edge of the concrete highway. A cloud of dust arose at the point of impact. From the point of impact the death car swerved eastward to the middle portion of the east half of the highway, then swerved to the west coming to a stop at the west edge of the highway and approximately 174 feet south of the point of impact.

The Thatcher car made no skid marks whatsoever and after it had been clocked at 60 miles per hour its speed did not appear to slacken before the impact. Norma Thompson was thrown 87 feet south of the point of impact and 17 feet west of the highway. She died ten hours later. Sergeant David Bornstein was thrown 43 feet south of the point of impact and 9½ feet west of the highway. He died a few days later. The post that holds the right door and windshield on the death car was bent to a curve and the right half of the windshield was shattered. The dirt on the right front fender and hood had been brushed off (apparently an object had slid over it) when the patrolmen examined the car.

The five pedestrians had been walking south on the gravel shoulder of the highway and at no time had they walked on the cement portion of the highway. Shirleen Thompson and Corporal Lester E. Bunker were in front with Shirleen on Corporal Bunker's left or nearest to the highway. The other three were immediately behind them, Sergeant Bornstein in the center with Norma Thompson

on his left nearest the highway and Erma Thompson on his right. The three Thompson girls were sisters. Just an instant before the impact Corporal Bunker looked back, saw the lights of the oncoming car and made a quick jump to the west pulling Shirleen with him and grabbing Erma as he turned and jumped. The three were unharmed. The death car tore a triangular piece of cloth out of Corporal Bunker's trousers a little below the left hip pocket as the car passed by. The piece of cloth was later taken from the rear part of the front right fender toward the running board. Norma Thompson and Sergeant Bornstein were struck by the car and thrown the approximate distances indicated above.

At the time of the accident the highway was dry; the night was dark—the moon was not out—but there were street lights along the highway, although it was not known as to their location. The five pedestrians were wearing light colored clothing.

These facts in most instances were testified to by at least two witnesses.

The primary question to be determined is: Was the evidence produced by the state sufficient to require the court to submit the case to the jury?

It is a well established legal principle that a motion of dismissal and for direction of verdict for defendant is, in effect, a demurrer to the evidence. It admits the truth of the evidence as disclosed by the record and every reasonable inference that might be drawn therefrom. When different reasonable inferences can be drawn from the evidence, the question is one exclusively within the province of the jury. It is not the function of the court to substitute its judgment on questions of fact for that of the jury. Therefore, in considering the question of the sufficiency of evidence, the record must be viewed in the light most favorable to the state. *State* v. *Rosser*, 162 Or. 293, 86 P. 2d 441, 87 P. 2d 783, 91 P. 2d 295.

In outlining the facts above in detail we are cognizant of defendant's argument that the pedestrians were on the

west portion of the cement highway at the time of the impact and that defendant's car did not go onto the gravel shoulder. Defendant bases this argument on the testimony of the two highway patrolmen who were unable to say from their position whether defendant's car merely veered to the edge of the cement portion of the highway, or went off. They did, however, see the cloud of dust arise and in view of the positive testimony of Corporal Bunker and Shirleen Thompson (Erma Thompson was not called as a witness) that all five pedestrians were on the gravel shoulder at the time of the accident, and had been at all times as they walked south, the defendant's deduction of the testimony is at the most a jury question, provided the facts set forth in this opinion are sufficient to warrant a finding of criminal negligence.

The state relies upon three specifications of recklessness as set out in the bill of particulars: (1) Dangerous and excessive speed, to wit: 60 miles per hour. (2) Failing to keep a proper lookout. (3) Failing to keep his car under proper control. The excessive speeding would constitute a basis for a charge in violation of Sec. 57-7-113, U. C. A. 1943, —Speeding, and any combination of the above acts considered together would constitute a basis for a charge in violation of Sec. 57-7-112, U. C. A. 1943,—Reckless Driving.

It is now the well-established law of this state that when a violation of Title 57 is relied upon as the basis for a charge of involuntary manslaughter "the 'unlawful act,' that is, the infraction, must be done  *  *  *  in marked disregard for the safety of others." Such conduct constitutes criminal negligence. On the other hand, "a mere thoughtless omission or slight deviation from the norm of prudent conduct" is not sufficient to support a finding of criminal negligence. *State* v. *Lingman,* 97 Utah 180, 91 P. 2d 457, 466; *State* v. *Newton,* 105 Utah 561, 144 P. 2d 290; *State* v. *Gutheil,* 98 Utah 205, 98 P. 2d 943; *State* v. *Adamson,* 101 Utah 534, 125 P. 2d 429; *State* v. *Busby,* 102 Utah 416, 131 P. 2d 510, 144 A. L. R. 1468; *State* v. *Bleazard,* 103 Utah 113, 133 P. 2d 1000.

As hereinabove pointed out one of the reckless acts relied upon by the state was that defendant failed to keep his car under proper control. In this respect the evidence showed that defendant's car in veering to the right was gradual until after the impact had occurred. There was also some testimony that defendant knew the patrol car was behind him and was gaining speed as though to pass, but there was no testimony that defendant knew they were patrolmen. This fact may have attracted defendant's attention and caused him to take his eyes off the road immediately in front of him, but we do not believe this evidence would have been sufficient to have justified the jury in finding that defendant lost control of his car to such an extent that he was unable to turn to the east or left a sufficient distance to pass the pedestrians unharmed. Our conclusion on this point, however, did not justify the court in taking the case from the jury.

Although the evidence may not have been sufficient to have proven that defendant was traveling as fast as 60 miles per hour as testified to by the patrolmen, nevertheless, after a careful examination of the record, we conclude, that the jury could have found from their testimony that defendant was exceeding the speed limit and that said speeding was a proximate cause of the accident. Had defendant been traveling within the speed limit he would have had the pedestrians within the range of the car's headlights for a longer period of time, and this fact would have given him a better opportunity to have seen the pedestrians and then turn slightly to the left, thereby avoiding the collision.

The fact that there was a group of five people, three girls, wearing light clothing, and two soldiers in summer uniform, walking on the shoulder of the road but near the west edge of the cement portion of the highway in the same direction as the defendant's car was traveling, and that this group maintained the same relative position on the shoulder of the highway as defendant approached, and that he veered to the right and drove directly into them,

would, in our opinion, be sufficient evidence to justify the jury in finding that defendant failed to keep a sufficient lookout to discover their presence in time to avoid a collision with them.

We conclude that defendant's failure to keep his eyes and attention on the road in front of him while driving at a high rate of speed at nighttime was sufficient evidence to have justified the jury in finding that his driving was in marked disregard for the safety of the deceased or criminal negligence. The trial court erred in granting defendant's motion of dismissal.

Prior to the filing of this information for involuntary manslaughter, the defendant was charged with and convicted of speeding. That prosecution involved the same act of speeding which is charged in this information. Defendant has pleaded the former conviction in bar of this action, and in support thereof relies on Sec. 103-1-22, U. C. A. 1943, which provides:

"An act or omission which is made punishable in different ways by different provisions of this code may be punished under any one of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

The trial court held that defendant had been once punished for the act of speeding and that this statute prohibits the court from considering that act of speeding as an element of this charge of involuntary manslaughter. Under the doctrine of former jeopardy, ■ both at common law and as contained in Sec. 105-25-13, U. C. A. 1943, if the two actions were for the same offense, the former was a complete bar to the latter, but if they were not for the same offense, the former was no bar to any element of the latter, even though such element was common to both actions.

So under Sec. 103-1-22 it is evident that it was intended to bar the second action only if the act as a whole charged

therein was the same as in the first. On the other hand, where the act as a whole was not the same in both actions, it was not contemplated to bar the use of some element in the second action because it was also an element in the first prosecution. The section uses the term "an act or omission" which is punishable by different provisions of the code, thus indicating that the "act or omission" contemplated all the elements of an entire offense, rather than merely one or a portion of the elements thereof. It also provides that "an acquittal or conviction and sentence" under one section of the Code "bars a prosecution for the same act or omission under any other." A prosecution is for the entire offense and not for the separate elements thereof. If a prosecution is barred, it bars the entire action and not merely the use of certain elements thereof. So our question is whether as a whole the acts charged in the two actions are the same. If they are, then the second prosecution is barred. If they are not, then the action is not barred even though some of the acts proved in the first prosecution are also elements of the second. Although no discussion of this point was made in *State* v. *Empey*, 65 Utah 609, 239 P. 25, 28, 44 A. L. R. 558, it was so treated.

On the main question of whether the act charged in the two cases is the same, so that the second prosecution is barred by a conviction of the first, the same question was presented in *State* v. *Empey*, supra, and in discussing it we said:

"* * * The collision and consequent injury of Miss Baker was, however, clearly not a necessary element or ingredient in the charge of careless and reckless driving while in an intoxicated condition, which was the gravamen of the charge included in the complaint before the justice of the peace, and upon which defendant was convicted. The offense charged in the complaint on which defendant was tried in the justice court was complete before his automobile struck the automobile in which Miss Baker was riding. He necessarily would be guilty of the offense there charged, although he had not struck or touched the other automobile."

What is there said applies with equal force to the present case. Here the act charged is running into and causing the death of the deceased; in the former action the act charged was speeding. While the running into the deceased may have been caused by the speeding charged in the first prosecution, still taken as a whole the act charged in the two actions are distinctly different, and therefore the conviction and sentence in the first does not bar the second prosecution.

The Empey case suggests that U. C. L. 1917, Sec. 8520, now Sec. 103-1-22, U. C. A. 1943, does not add anything to the former jeopardy law as contained in Sec. 8905, now Sec. 105-25-13, U. C. A. 1943, and as it was understood at common law. What was said in that regard was not necessary for the decision in that case nor is it necessary for the decision in this case. We therefore express no opinion thereon.

This being an appeal by the state in a criminal case, the case is reversed but the trial court is directed to proceed no further.

WOLFE, Justice (concurring).

I concur. There seems to be a slight implication in the opinion that had the evidence shown that the defendant had his eyes taken from the road because of the thought that the patrolman's car was trying to pass and because of that fact had lost control of his car "to such an extent that he was unable to turn to the left" and avoid the accident, the jury would have had to find him not guilty. In measuring defendant's criminal responsibility for the accident the jury is entitled to take into account all the circumstances surrounding the accident. Even had the defendant lost control of his car because of the reasons above stated, such loss of control might itself have been due to driving in such fashion as to show a marked disregard for the safety of others. The matter would still be for the jury. The evidence in this case was clearly sufficient to have justified the jury

in finding defendant guilty of involuntary manslaughter. There have been more flagrant cases of recklessness, but in many cases where there was less, drivers have been found guilty.

In ruling on a motion to take a criminal case from the jury, the court must give the benefit of all reasonable inferences and intendments to the state. It is contended that because the trial court had the opportunity to note the demeanor of the witnesses some weight, independently of the record, should be given to his judgment dismissing the action. This is not the law. Before the trial court can tell the jury that it cannot consider the testimony of a particular witness it must appear from the record that it was so untrustworthy that no reasonable man could have given it any weight. And only if an essential element of the state's case is based entirely on such evidence could the court withdraw the case from the jury. Where inferences and conclusions may reasonably be drawn from the testimony which would support a verdict of guilty, we cannot indulge the trial court the luxury of presuming independently of the record that the demeanor of the witnesses was such that it nullified such inferences and conclusions. To do so would bring to a standstill any review by this court of the question of whether reasonable men could draw from the evidence a conclusion of guilt. Upon dismissal of a criminal case the answer would always be that within the breast of the trial court resided knowledge not revealed by the record that the witnesses were so untrustworthy as to overcome any inference of guilt which could be drawn from the record itself. The rule which must be applied upon a motion to dismiss a criminal case is that all reasonable inferences are to be taken in favor of the state, and only if the record itself reveals that no reasonable man could draw an inference of guilt therefrom is the trial court justified in taking the case from the jury. No such situation is revealed by this record.

So important is it that the above be understood and that there be no confusion regarding it that it may perhaps pay

to resort again to first principles. It is common place in our system of jurisprudence that the court decides only questions of law and the jury questions of fact. ■ Each has its judging functions and each is an equally important department of the judicial institution we call the court. Neither is supposed to trespass in the province of the other. This is so fundamental that no authority need be cited for it. In this case it is requisite that we determine the line separating the functions of each. Ordinarily we say that it is for the jury and not the court to "weigh" the evidence. That means that where there is any substantial evidence to go to the jury in favor of both sides it must go to the jury so that the jury may put all the evidence for one party on one scale and balance it against the evidence for the other party placed on the other scale. The ultimate purpose of introducing testimony is to bring to the fact-finder the truest and clearest picture of the events which happened outside of the court room and which form the subject of the inquiry. This involves not only an assay of the probative force of the testimony as it comes from the witness, but an assay of the credibility of the witness as an instrumentality for the registering, remembering and transmitting sense impressions of the event to the fact-finders. The jury must, therefore, not only weigh the evidence of one party as against that of the other but must appraise the testimony of each witness of each party in relation to the testimony of other witnesses of that party and of the other party. The testimony of each witness as to any material fact is an illuminating light which bears on the testimony of any other witness to that fact and either accentuates, detracts or modifies or nullifies it or is accentuated, detracted from, modified or nullified by such other testimony. And not only does the probative force of any testimony depend on its nature and content, but as said before, on the credibility of that witness as an instrument to observe and convey. That in turn depends on his opportunities for observing, his capacity for accurately registering and retaining his im-

pression, his ability to translate and express into words his retained sense impressions, his desires to accurately do so as influenced by his motives and his general sincerity and truth telling habits. All these things must be judged by the fact-finder. Judgment as respects the reliability of the witness as a good or bad instrumentality for recording, retaining and relaying sense impressions largely depends on the demeanor of the witness and the intrinsic credibility of the testimony he gives in relation to other testimony. If, for instance, one witness gave as his opinion that a car was going 150 miles an hour his ability to judge speed would be sorely doubted even though he were sincere and candid. All this is involved in weighing the evidence in order to get a vector addition of the testimony of each party before it is balanced against the vector addition of the testimony of the opposing party.

The judge has very little to do with this process. He determines whether offered testimony has any probative force, i. e., whether it tends to prove or disprove an element of the case and according to that judgment he admits or rejects it. Once admitted it is for the jury. See for example, *Coleman* v. *Commonwealth*, 25 Grat. 865, 23 Am. Rep. 711, wherein the Court of Appeals of Virginia held that it was a question for the judge whether or not the testimony of a lunatic should be admitted, but once admitted, the weight to be given such testimony was exclusively for the jury.

There are, of course, situations under which the case should not be submitted to a jury. One of these would be where there was no substantial evidence (and that does not mean a substantial amount of evidence but substantial in the sense of having substance). Perhaps also in the rare case where there can be no doubt that testimony of all witnesses as to one or more essential elements in the case appears from the record to be so inherently improbable that no reasonable man could give weight to it the case could be taken from the jury. See *Jeannerette* v. *Taylor*, 2 Cal. App. 2d 568, 38 P. 2d 831.

But "mere contradictions of the testimony of a witness will not suffice to constitute inherent improbability or to destroy its weight" so as to justify a court in. disregarding such testimony. *Sanborn* v. *Sanborn*, 3 Cal. App. 2d 437, 39 P. 2d 830, 831. See also *Goldsmith* v. *Kingsford*, 92 N. H. 442, 32 A. 2d 810. Perhaps in the case where there is a mountain of evidence on one side as against a molehill on the other all of equal quality as shown by the record so that no jury of reasonable men could determine otherwise than for the preponderance the case might be taken from the jury, but the preponderance would have to be overwhelming. Also in criminal cases the case may be taken from the jury where it can be said beyond doubt that no reasonable men could find the defendant guilty without entertaining a reasonable doubt.

It is clear from the cases, however, that in none of the circumstances set forth above may the court take into consideration the demeanor of witnesses. In ■ *Lances' Estate*, 216 Cal. 397, 14 P. 2d 768, 769, the Supreme Court of California ruled that

"the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict."

Such has been the holding of common law courts for so long that it must be considered fundamental to our system of jurisprudence where the judge and the jury each plays the proper role. See *Estate of Flood*, 217 Cal. 763, 21 P. 2d 579; *Cash* v. *Los Angeles Ry. Corp.*, 6 Cal. App. 2d 738, 45 P. 2d 280; *Lake County* v. *Mass. Bonding & Ins. Co.*, 5 Cir., 75 F. 2d 6; *Dupea* v. *City of Seattle*, 20 Wash. 2d 285, 147 P. 2d 272; *National Bank of Virginia* v. *Mills*, 99 N. Y. 656, 2 N. E. 27; *State* v. *Williams*, 47 N. C. 257; *Pierce* v. *Selleck*, 18 Conn. 321; *Parsons* v. *Hugg*, 41 Me.

410; *Newcomb* v. *State*, 37 Miss. 383. Therefore, no weight should or can be given to the fact that the trial judge saw the witnesses in this case. All inferences were to be taken in favor of the state and the credibility of the witnesses could not be considered by the trial judge. The instant case does not present a situation which comes within a stone's throw of any of the situations mentioned above under which the court could take the case from the jury. The evidence, when reviewed most favorably to the state, would clearly support a conviction.

In determining whether or not a case is to go to the jury, the trial judge has no discretion. If the evidence falls into one of the above enumerated categories the judge should not submit it to the jury. If the evidence under any reasonable interpretation would sustain a verdict of guilty, the judge is required to let the case go to the jury. The question is the same approached from different directions whether the case is submitted when it should not have been, or whether it was not submitted when it should have been. Upon motion for a new trial the court may

"review the evidence, consider its weight and the credibility of witnesses, and grant a new trial, if satisfied that there is a marked and clear preponderance of the evidence against the verdict." *Valiotis* v. *Utah Apex Mining Co.*, 55 Utah 151, 184 P. 802, 807.

But it should not review the evidence and consider the credibility of witnesses before then. See cases last cited above.

Taking the evidence most favorably to the state the jury could have reasonably concluded that the defendant was driving in an area where it should have been anticipated that people might be walking; that he approached this area at an excessive rate of speed; that he was not keeping a proper lookout for pedestrians walking on the shoulder of the road; that his swerving over to the right and hitting them was because of his failure to keep a proper lookout

or failure to properly guide his car or keep it under control or both; and that such conduct as a whole constituted driving in marked disregard for the safety of others.

It has been argued that the officers could not possibly have been correct in their estimate that the defendant was driving 60 miles per hour. This argument is based on a consideration of the distances involved together with the time it would have taken a car traveling 60 miles per hour to traverse said distances. But it should be noted that any meticulous analysis of the evidence to uncover a flaw in the officers' testimony regarding speed may be completely nullified by the jury's conclusion that the officers were substantially correct about speed but in error as to distances. Such inferences are for the jury and show the futility of members of this court choosing one inference or conclusion as against another. While some of the distances around the point of impact and the overall distance traversed by the two cars could have been measured with accuracy, distance between the two moving cars at any point along the highway could not have been measured. They are and necessarily must have been estimates and the officers themselves clearly so stated time and again.

For example, in the answer to a question as to how far the defendant was ahead of the officers when the officers straightened their "car out going in a southerly direction Highway 91," Beardall answered

"Oh, I would say he was two or three hundred feet, such a matter."
"Q. We would like it a little more accurately, if you will give us the * * * A. I don't believe I could give it to you more accurately."

And again in questioning Evans, the question was put:

"Q. Now, what is the fartherest distance, in your judgment, that that car was ahead of you before the accident occurred? A. Oh, it is all estimation: I would say as high as six hundred feet.
"Q. Could it have been six hundred feet ahead of you? A. Five or six hundred."

The record is replete with such testimony. Too, the police car was equipped with a speedometer which the officers state showed that the defendant's car was going 60 miles per hour. A jury could equally well believe that the officers misread the measurements as they could believe that they misread the speedometer, or it could have concluded that the officers were in error as to both.

Aside from this, there is direct testimony that the defendant approached the intersection at what appeared to the officers to be a high rate of speed. These officers attempted to overtake the car and thus had further opportunity to observe whether or not defendant was speeding. Thus even if it were conceded that the defendant was not for the full half mile involved traveling 60 miles per hour, there certainly is evidence from which the jury could have found excessive speed.

There is some argument to the effect that the defendant was keeping a proper lookout and some intimation that the officers came alongside and crowded him into the pedestrians. But the inferences are the other way. The fact that defendant hit the pedestrians, if not explained, would itself justify an inference that he was not keeping a proper lookout. The attempt to explain the collision by arguing that the officers crowded him into the pedestrians in effect asserts that the jury, if it acted reasonably, would have been compelled to so conclude. The only intimation in the entire record that the officers were crowding the defendant is the statement by witness Beardall that

"as we pulled up right close to the car, oh, I imagine we hadn't got started to pull him off, then up came a cloud of dust."

Far from the jury being compelled from this to conclude that Beardall had started to crowd the defendant from the highway it could have concluded from the record that the officers had not yet caught up to the defendant's car. Regarding the position of the officers' car Beardall testified that it was 150 feet behind the defendant's car when the

dust arose; that when the defendant was twenty to thirty feet farther along the highway the officers' car was 100 feet behind; and that the officers' car was 150 feet behind at the point of impact. Since it was night the officers could hardly have seen the cloud of dust had the dust not been within the focus of the headlights of their car. Moreover, if the officers' car was crowding the defendant's car by a gradual cutting in at the front left corner, which is about the only way it could "pull him off the highway," it might be difficult to see how the Thatcher car could have made that serpentine movement back and forth across the road without colliding with the officers' car. And if the officers were cutting in on Thatcher is it not probable that Thatcher would have applied the brakes leaving skid marks? The inference seems not only reasonable but rather compelling that the Thatcher car after the impact with the pedestrians careened back and forth across the road and came to rest and that the officers then passed him, turned around and returned to the scene of the accident. But I am indulging in mental process which befit jurymen. Certainly from the evidence the jury could have concluded that the officers had not started to pull defendant off the highway but were merely pursuing him with that intention; that defendant struck and killed the pedestrians because he was not keeping a proper lookout although he should have anticipated the presence of pedestrians in that vicinity.

McDONOUGH and WADE, JJ., concur with Judge COWLEY and also with Mr. Justice WOLFE.

LARSON, Chief Justice (dissenting).

I dissent. In the first place, to my mind the statement with respect to the facts does not fairly reflect the record. In the second place, the opinion is founded on a wrong concept as to the legal principles governing the approach to the problem before us. Thirdly, the facts set forth in the record do not show any criminal negligence. Fourthly, the record indicates that the accident was not the result

of any negligent act of defendant, but the result of the acts of other parties. I shall outline under these four points, the places wherein I think the prevailing opinion is in error.

First: The opinion states that "immediately after this car [Thatcher's] had been clocked it commenced veering to the right." The testimony of both patrolmen is to the effect that at the clocking the patrol car was 150 to 200 feet behind Thatcher and they then started to overtake him and pull him off the road. When they started to pull him off the highway, or when they were just back of him, trying to come around him to pull him off the road, the Thatcher car veered to the right, and a fluff of dust blew up. I note this difference because I do not think the record justifies the conclusion or inference that the car was veering off so that its lights would show the people on the shoulder of the road before the instant of impact. I shall advert later to further significance of the distinction, in noting the fourth point. The prevailing opinion says: "A cloud of dust arose at the point of impact." I shall say something later about the point of impact. Both patrolmen testified that they never saw any pedestrians, never had any view of the pedestrians—the first time they saw any pedestrians was, they say, after they had stopped and turned around; that the dust did not obscure the view. In the language of patrolman Evans, "it wasn't very large—it was just a small clump of dust arising. *It didn't cut out our vision any.*" (Italics mine.) These bits of the record in themselves are trifling but they seem to be the sand upon which the house of the prevailing opinion is built. Later on I shall let the rain descend upon that house.

Second: The majority opinion says

"the primary question to be determined is: Was the evidence produced by the state sufficient to require the court to submit the case to the jury?"

That is the question. But the opinion does not consider the evidence from that point of view. It seems to treat

the matter as though the question were: Was the evidence such that we would not hold the court in error had he submitted the case to the jury? If the court had submitted the case to the jury and Thatcher were complaining that the court should not have done so, the way of approach and the conclusions reached by Judge Cowley might be correct. We would then examine the record to see if the evidence *would justify* the court in submitting the case to the jury. Here the trial court did not do so, and we are asked to hold that the evidence was such that *it required* the court to submit the case to the jury. The situation is reversed, the ruling was the opposite way, and the approach to the problem must be from a different premise.

The trial court presided over all proceedings; it saw and heard the witnesses; it was familiar with the evidence; it was called upon to rule and pass on a motion regularly presented at the close of the state's case. That motion to dismiss called upon the court to review, consider and take stock of the evidence, and to weigh the same, for the purpose of determining whether, in the reasoned judgment of the court, there was sufficient credible evidence of criminal negligence to justify a verdict of guilty against the defendant. In such a case, if the evidence is strong or definite or positive or probable, and covers each point the state must prove, there is no call for the exercise of the court's reasoned judgment or discretion, and the motion should be denied. 23 C. J. S., Criminal Law, § 1143 p. 657; *State* v. *Whitman,* Mo., 248 S. W. 937; *State* v. *Loges,* 339 Mo. 862, 98 S. W. 2d 564. If the evidence is wholly lacking on any of the essential facts the state must prove, or if the evidence is so weak, uncertain, or unstable as in the opinion of the court to be unworthy of belief, he is under the duty to dismiss the action. *Allison* v. *State,* 11 Okl. Cr. 508, 148 P. 824; 23 C. J. S., Criminal Law, § 1143, p. 657; 16 C. J. 934, and note 55; *People* v. *Broderick,* 146 Misc. 566, 262 N. Y. S. 602; *People* v. *Fazio,* Misc., 5 N. Y. S. 2d 195; *U. S.* v. *Morley,* 7 Cir. 99 F. 2d 683; 23 C. J. S., Criminal Law, § 1149, p. 679. Between these two extremes lie the cases where there is some

evidence pointing to the essential facts which the state must prove, but such evidence is meager, or unstable, or indefinite, or uncertain, or improbable, or unworthy of belief. The court is then called upon to review, consider and weigh the evidence, and determine whether in its reasoned judgment the jury could without the use of far fetched inferences, find as reasonable men, that defendant was guilty. Such a situation poses a problem where the court in weighing the evidence might incline either way. This comes within the field of its judicial discretion. Since the trial court sees the witnesses, hears them, and has before it all the elements and matters which enter most largely into determining the credibility or weight of the testimony it is in a better position to judge thereon than are we. On the written record, all witnesses testify with equal celerity, without hesitation, without an unnatural desire to talk, without heat and without embarrassment and doubt. Hence the rule that on such matters, where the trial court has all the advantages for consideration of the testimony, its judgment is final and conclusive and we will not disturb it. In *State* v. *Karas,* 43 Utah 506, 136 P. 788, 790, this court, speaking through Mr. Justice Straup, discussed this matter at some length, and there stated:

"Evidence which tends to prove a fact in issue, however slight that tendency may be, of course, is admissible. But whether it alone, or when considered with all the evidence in the case and in the light most favorable to the party adducing it, is sufficient to justify a finding as to such fact, is a question for the court, not the jury. * * * Because evidence relevant to or bearing upon some fact in issue, and hence admissible though however slight its tendency may be to prove it, has been received does not authorize a jury, on the theory that they are the sole judges of its sufficiency to induce belief and to establish a fact, to give such effect to it, when within the range of reasonable probabilities, inferences, or deductions, such a finding cannot justifiably be made. * * * But in every case, before its submission to the jury, there is always a preliminary question of law for the court whether there is sufficient evidence upon which the jury may properly proceed to find a verdict. There is hence nothing to the conclusion that since admissible evidence bearing on or relevant to identity was adduced and received, and

inasmuch as the jury are the sole judges of the facts, the weight of the evidence, and the credibility of the witnesses, the question of sufficiency to establish the fact of identity was for the jury. For the court was called upon to determine, as a preliminary question of law, whether there was sufficient evidence to justify a finding that the defendant was the perpetrator of the offense."

And in *State* v. *Burch,* 100 Utah 414, 115 P. 2d 911, 912, we said:

"If circumstantial evidence is submitted to a jury, it is accompanied by an instruction that to convict upon such evidence, that evidence must exclude every reasonable hypothesis of innocence. That such an instruction is given implies that there is a question for the jury to decide as to whether or not such evidence does exclude that hypothesis. But, if the evidence is such that reasonable men would not differ upon the fact that it includes such an hypothesis, then it is not a question for the jury, but is one for the court."

And in *People* v. *Frahm,* 107 Cal. App. 253, 290 P. 678, 681, the court said:

"Even though a prima facie case had been made as to the defendant Kucera's guilt, the trial court must have thought that the evidence was weak and of such an unsatisfactory character that it would not sustain or uphold a conviction. We cannot hold that this belief upon the part of the court was unfounded or that it was an abuse of discretion to discharge the defendant Kucera."

Third: The facts deducible from the record, in the light most favorable to the state, are simply these: On the night of August 8, 1943, Thatcher, a U. S. Navy boy, home on furlough, was driving a car southward on the state highway through the town of Orem. As two state road patrolmen in a car coming west on Canyon Road stopped for the intersection of Canyon road and State Street, Thatcher crossed such intersection traveling about forty-five miles per hour. The statutory speed limit on State Street was fifty miles per hour, but the state road commission had posted signs reading 35 miles per hour. The patrolmen thought Thatcher was driving too fast, so pulled into the intersection, turned south and speeded up to overhaul

him.  At one point the patrolmen attained a speed of
seventy-five miles per hour.  When about 150 feet from
Thatcher, the patrolmen slowed up to sixty miles, clocked
Thatcher at that speed, and then speeded up again to
"pull him off the road."  There was no other traffic on the
paved street, but five pedestrians were walking southward
along the west dirt shoulder of the highway nearly one-half
mile south of the aforesaid intersection, at a point referred
to as the Stratton Fruit Stand.  Thatcher was driving
in a straight line, his right wheels following a tarred line
about four feet in from the edge of the pavement.  At about
the point of the fruit stand, as the patrolmen speeded
up on a line to the left of Thatcher's car to "pull him off
the road," the Thatcher car veered to the right, where it
struck some of the pedestrians, turned across the pave-
ment to the east or left side, came back across to the right
shoulder and stopped at a point about 110 feet south of the
fruit stand.  The patrol car did not swerve from its course
but continued to a point beyond that at which the Thatcher
car stopped, turned around and came back northward.
The headlights then revealed a lady's slipper in the road,
north of the Thatcher car, and three pedestrians standing
about ten feet south of the fruit stand.  That was the first
time the patrolmen had seen the pedestrians.  When they
stopped their car they saw two injured persons lying west
of the shoulder of the road.  Both died later, and upon such
deaths this charge of manslaughter is founded.  These
are all the facts that are not against the state.

I now note some other matters in the state's evidence
which are in no sense helpful to the state.  The testimony
of the state's witnesses makes frequent reference to what
they call the "point of impact," or what they treat as the
place where the people were struck.  The witnesses said
frankly there were no marks on the road to indicate where
the persons were struck; that they could not tell where
it was; that they decided on this particular spot, 49 feet
north of the fruit stand, because lying west of the highway
at that point were part of a package of cigarettes and

part of a match folder. They did not pick them up. There is no evidence that these articles belonged to any of the five persons; no evidence that any of them ever used any cigarettes, ever lost any, or ever had any. An inference therefore that this was was the point of impact is pure unadulterated assumption. Furthermore, the evidence is rather definite that this was not the point of impact. The two injured persons were found lying some 87 feet and 43 feet, respectively, south of this point; the lady's slipper was 30 feet south. The pedestrians who were not hurt testified they jumped off the shoulder and to the west. They were located about ten feet south of the fruit stand, and there is no evidence that prior to being located there they had moved since they jumped off the shoulder. Shirleen Thompson said the impact occurred exactly in front of the fruit stand. Every scintilla of evidence pertaining to the impact therefore would locate that point at or a little south of the fruit stand. This would place the position of the injured people 48 feet and 25 feet, respectively, from the point of impact, instead of the distances contended by the state. This is significant only as it reflects upon the place of the accident (referred to again later) the force of the impact, and speed of the car, and the general credibility and weight of the testimony.

The second kink in the evidence, sticking out like a sore thumb, is the contention that Thatcher's car, which admittedly was the slower, veered to the right, struck the people, swerved to the left across the road and back to the right side, and stopped, without causing the patrol car to change its course, although the patrol car was at the left of the Thatcher car, or immediately to its left rear, just starting to or ready to "pull him off the road" when Thatcher veered to the right. Why did the patrol car go down the road beyond the point where Thatcher stopped and then turn around and come back north? They had seen no pedestrians, and knew of no accident. The logical inference is that their speed was so great they were carried well beyond Thatcher's stopping point before they stopped.

Another quandary is the testimony with respect to speed. If Thatcher were traveling 60 miles per hour, as the patrolmen say they clocked him (and they say he was at one point 600 feet ahead of them), he would travel 88 feet per second, or use 30 seconds to travel from Canyon Road to the scene of the accident. If the patrolmen had traveled the entire distance at their greatest speed of 75 miles per hour (neglecting entirely the fact that they started from scratch) they would require 27 seconds to make up or overcome the 600 feet Thatcher was ahead. But to make up a difference of 600 feet, the patrol car would travel a distance of 2,970 feet, or to a point 330 feet beyond (south) of the scene of the accident. When you allow that the patrol car started from scratch, picked up to 75 miles per hour, slowed up to 60, clocked Thatcher, and again picked up speed to "pull him off the road" all in a lapse of 27 seconds of time, which they would need at 75 miles per hour to overcome the lead they say he had, it just makes the speed schedule a physical impossibility. I readily concede such speeds and distances are estimates, but since we must conclude that the patrolmen knew their own speed, which they say never exceeded 75 miles per hour it simply must follow that Thatcher's speed was far less than that which they stated. If Thatcher's speed was 45 miles per hour, the time and distance schedule could fit as a practical possibility. In fact that figures out just about right to balance with the patrolmen's speed and distance.

Do the facts show criminal negligence—that is, marked disregard for the safety of others? As pointed out in the prevailing opinion, the state relied upon three grounds. Also as indicated by Judge COWLEY we are agreed that the evidence is insufficient to justify the jury in finding that Thatcher lost control of his car, and if the evidence would not justify such finding, the trial court was not in error in taking the case from the jury upon that ground.

The opinion concludes that Thatcher was traveling at an unlawful speed, to wit 60 miles per hour, and that the

jury could have found that such speed was criminal negligence. We have shown conclusively that for him to have been traveling 60 miles per hour is a physcial impossibility under the facts and circumstances and the positive evidence. If the state's witnesses are to be believed at all, his speed could not have been more than 45 miles per hour. The statutory speed limit was 50 miles per hour. But the question is not: Could the jury have so found, but under the evidence was the court *required* to let them speculate on the matter?

The opinion says that had Thatcher been driving slower he would have had the pedestrians within the range of his headlights for a longer period of time and thereby would have had a better opportunity to avoid hitting them. Had he been sitting still he would not have hit them at all. The question is not, should he have been driving slower; or, was it negligence to drive at that speed; but was it *criminal negligence* to drive at the speed he did considering the state of traffic on the highway? The opinion holds that because Thatcher's car veered to the right and struck the pedestrians, the jury could find that he failed to keep a lookout to discover their presence. The question is not, could the jury so have found, but was the court *required* to permit them to so find?

The opinion finally states its position thus:

"We conclude that defendant's failure to keep his eyes and attention on the road in front of him while driving at a high rate of speed at nighttime was sufficient evidence to have justified the jury in finding that his driving was in marked disregard for the safety of [others]."

Before analyzing the statement, I remark again, the question here is not whether the jury could have so found, but whether the court was *required* to permit them to consider that question. In *State* v. *Lingman*, 97 Utah 180, 91 P. 2d 457, 465, this court, speaking through Mr. Justice Wolfe, made an exhaustive examination and discussion of

the manslaughter statute especially with regard to death by automobile, and pointed out that there may be many deaths from violation of traffic laws or rules which do not give rise to a criminal action. We there said:

"Where is the line at which the infraction becomes more than civil negligence, that is, criminal negligence? * * * We think the 'unlawful act,' that is, the infraction, must be done in such a manner as to more than constitute a mere thoughtless omission or slight deviation from the norm of prudent conduct. It must be reckless or in marked disregard for the safety of others. When it does that, it passes the stage of mere malum prohibitum and approaches the unsocial aspects of malum in se. * * * Criminal negligence therefore sufficient to satisfy arm (a) of the manslaughter definition means more than mere thoughtlessness or slight carelessness. It means reckless conduct or conduct evincing a marked disregard for the safety of others."

In *State* v. *Adamson*, 101 Utah 534, 125 P. 2d 429, 430, in reversing the judgment, we said:

"Does the evidence show that defendant was driving 'recklessly or with marked disregard for the safety of others?' This question must be answered in the negative."

and quoted as authority the foregoing statements from Mr. Justice Wolfe. And in *State* v. *Gutheil*, 98 Utah 205, 98 P. 2d 943, 944, we said:

"What was it that Gutheil did or did not do that shows he acted recklessly and in marked disregard of the rights of others?"

That is the law in this jurisdiction. Criminal negligence or marked disregard for the safety of others must be manifested by a reckless disregard of consequences, or a needless indifference to the rights and safety of others; *Croker* v. *State*, 57 Ga. App. 895, 197 S. E. 92; *State* v. *McMahan*, 57 Idaho 240, 65 P. 2d 156; by such conduct as from which it could be reasonably foreseen that death or bodily injury could be a probable result thereof; *State* v. *Agnew*, 202 N. C. 755, 164 S. E. 578. It is conduct which constitutes such a departure from what would be the conduct of an ordinarily careful and prudent man under the

same circumstances as to furnish evidence of that indifference to consequences which in some offenses takes the place of criminal intent. *French* v. *State*, 28 Ala. App. 147, 180 So. 592, 594. It is such negligence as amounts to a wilful indifference to the injury liable to follow, *Jones* v. *Chicago, R. I. & P. R. Co.*, 8 Cir., 260 F. 929; it is manifest when the negligent conduct is incompatible with a proper regard for human life, *Schultz* v. *State*, 89 Neb. 34, 130 N. W. 972, 33 L. R. A., N. S., 403, Ann. Cas. 1912C, 495. To constitute criminal negligence there must enter into the act some measure of wantonness or flagrant, or reckless or marked disregard of safety, or wilful indifference. *People* v. *Driggs*, 111 Cal. App. 42, 295 P. 51. I find nothing in the record and the opinion points out nothing from which marked disregard for the safety of others (the test laid down in the Lingman case, supra) can be found or inferred. The opinion gives us no help on this matter except ipse dixit.

Mr. Justice WOLFE has written a concurring opinion which to my mind does not strengthen the opinion of Judge COWLEY. Neither the prevailing opinion nor the concurring opinion cite any authority that requires a reversal of this judgment except ipse dixit. There is not a citation, nor a word of evidence given to indicate that there was anything done by Thatcher that showed a *marked disregard* for the safety of others. If the trial court was wrong in this case, then every case in which a death results should be submitted to a jury, and the Lingman case considered as overruled. It is no longer a question of criminal negligence, but did someone die? If so, it should go to the jury! Let me advert to the opinions. Judge Cowley concludes that speed was the proximate cause of the accident. But the speed basis for the opinion cannot be sustained. It is a physical impossibility and a mathematical monstrosity. I note that the concurring opinion, realizing the physical impossibility of the correctness of the officers' testimony as to speed and distances, argues that perhaps the jury would have concluded the officers were right as to speed

but wrong as to distances. That argument is untenable. The distances testified to were measured and taped off. There is no room for anyone to doubt or be permitted to doubt the distance from Canyon Road to 4th North Street or to the Stratton Fruit Stand. And that distance alone makes the speed impossible. I must conclude therefore that the trial court properly took the case from the jury.

Fourth: On State Street at the approaches to the intersection with Fourth North Street in Orem, there are built up in the center half of the paved highway traffic controls to direct through traffic to the outside of the road, and make a safety zone for cars intending to turn off into 4th North Street to slow up and wait an opportunity to make a turn through the north and south traffic. This narrows down the road for through traffic each way, to one-fourth the road width instead of one-half. I think the conclusion inescapable from the record that as Thatcher approached this traffic control, and the patrol car was coming up at a high rate of speed on a line at his left, as though bent on passing where the traffic control would force the patrol car over into Thatcher's lane of travel, Thatcher veered to the right to avoid a collision. Unfortunately the pedestrians, not seen by either car, were at that spot and the accident resulted to them rather than a collision between the cars.

I must conclude that there was no basis for this appeal, nor for reversal of the judgment under the provisions of the statutes. Appeals by the state in criminal cases lie only on questions of law, since defendant cannot be again brought to trial. An appeal therefore that does not settle a point of law which will be helpful in future cases is wholly abortive, a waste of time, effort and expense. This appeal settles nothing except that the prosecutor can say to the judge, now off the bench, "I told you so." The opinion is no guide or help in future cases, unless it be considered as overruling the Lingman case. Furthermore, Section 105-43-1, U. C. A. 1943, provides that this court must give judgment without regard to errors unless sat-

isfied that but for such error the judgment may well have been otherwise, and that "it shall not be presumed to have resulted in prejudice". Since the effect of the judgment, and the position and rights of the parties are the same regardless of reversal, and no law question is settled for future cases, the whole thing is in the nature of a sideshow —a moot entertainment without effect.

I think the action of the District Judge was the only proper course he could take.

TURNER, J., being disqualified, did not participate herein.