437 P.2d 434

**SALT LAKE CITY, a municipal corporation,
Plaintiff and Respondent,**

**v.**

Peggy ALLRED, aka Peggy Lovejoy, aka Thelma Allred, Defendant and Appellant,

Salt Lake County Bar Legal Services, Inc., Utah State Association of County Officials and Utah Municipal League, Amici Curiae on Petition for Rehearing.

No. 10752.

Supreme Court of Utah.

Feb. 8, 1968.

Hatch & McRae, Sumner J. Hatch, Salt Lake City, for appellant.

Don L. Bybee, Jack L. Crellin, Asst. City Attys., Salt Lake City, for respondent.

Ronald N. Boyce, Salt Lake City, for amici curiae.

COWLEY, District Judge:

The defendant was convicted in the city and district courts of aiding and abetting in the commission of a crime by directing a police officer to a certain apartment to obtain sexual intercourse for hire in violation of Section 32–2–1, subsections 7 and 8, of the Revised Ordinances of Salt Lake City, Utah, 1965. Defendant thereafter appealed to this court claiming that the ordinance under which she was convicted is invalid and unconstitutional.

This court held in a three to two decision that the state by enacting comprehensive and complete laws pertaining to sexual offenses which are covered by Sections 76–53–8 through 76–53–12, U.C.A.1953, and that said sexual offenses were felonies under said sections, had therefore pre-empted the field of sexual offenses, except in that area that dealt with the disorderly house and prostitution under the express grant conferred on cities under Sections 10–8–41 and 10–8–51, U.C.A., 1953, respectively. As a result, subsections 7 and 8 were found to be invalid and defendant's conviction was reversed.

A petition for rehearing was granted in this case to reconsider this court's previous opinion based upon the pre-emption theory.

The City and Amicus Curiae argue that the City has the authority to pass the ordinance in question by its general grant of police power under Section 10–8–84, U.C.A., 1953, which provides as follows:

**300**

They may pass all ordinances and rules, and make all regulations, not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this chapter, and such as are necessary and proper to provide for the safety and preserve the health, and promote the prosperity, *improve the morals*, peace and good order, comfort and convenience of the city and the inhabitants thereof * * *.

█ It is a well-settled rule that it is a proper exercise of the police power as set forth in the above statute to preserve and protect the public morals, and any practice of business which has a tendency to weaken or corrupt the morals of those who follow it, as shown by experience, is such conduct as affects the public morals. 16 Am.Jur.2d, Constitutional Law, sec. 309.

This court held in the case of Salt Lake City v. Kusse, 97 Utah 113, 93 P.2d 671 (1938), that the grant of general police power to cities under the predecessor statute to Section 10–8–84, U.C.A.1953, authorized the city to pass an ordinance to prevent driving while under the influence of intoxicating liquor. If the public health, safety, morals and welfare are properly involved in upholding a drunk driving ordinance, it would appear reasonable that sexual intercourse for hire and related offenses would be included in such general police power.

Also in accordance with the power contained in Section 10–8–84, U.C.A.1953, the Utah Supreme Court, in Ogden City v. Leo, 54 Utah 556, 182 P. 530, 5 A.L.R. 960, upheld as reasonable and valid a city ordinance prohibiting the maintenance of booths of certain dimensions in restaurants so as to prevent persons of both sexes having no regard for law or good morals from meeting in such places. If the prohibition involved in the Leo case had a reasonable relationship to the preservation of the public morals, the prohibition of an act of sexual intercourse for hire under the city ordinance in this case would also appear to bear a reasonable relationship to the preservation and protection of public morals.

The protection of public morals has always been a matter of local concern which requires regulation by municipalities, and properly falls within the scope of the police power, 42 Am.Jur., Prostitutes, Section 2; L'Hote v. City of New Orleans, 177 U.S. 587, 20 S.Ct. 788, 44 L.Ed. 899. The vice of prostitution and sexual offenses tends to increase and multiply according to the density of population which historically has required the municipalities to control and suppress such practices, and it can hardly be questioned that the practice of sexual offenses for hire and its allied activities properly falls under the exercise of the police power pertaining to public morals.

█ We are of the opinion that the general police power is a sufficient grant of authority to authorize the city ordinance involved in this case unless "prohibited by

statute or inconsistent therewith." Salt Lake City v. Kusse, supra.

■ There is nothing in the state statutes regulating sexual offenses that evidences any express or implied intent to preclude local governments from also attempting to prohibit and suppress the difficult problem of the sex offender. Therefore, it is our opinion that the City is not precluded in enacting the ordinance in question unless it is inconsistent or in conflict with the state statutes dealing with sex offenses.

■ It is a well-established principle in this state that the city has the right to legislate on the same subject as a state statute where either the general police power or express grant of authority is conferred upon the municipalities. Salt Lake City v. Kusse, supra; American Fork City v. Charlier, 43 Utah 231, 134 P. 739 (1913); Tooele City v. Hoffman, 42 Utah 596, 134 P. 558 (1913); Salt Lake City v. Howe, 37 Utah 170, 106 P. 705 (1912); Salt Lake City v. Doran, 42 Utah 401, 131 P. 636 (1913).

■ However, the defendant contends in the case before us that the ordinance in question is inconsistent and in conflict with state laws and therefore invalid on the grounds that the ordinance attempts to make crimes of acts which are not crimes under the state laws. Assuming this to be true, a careful examination of the city ordinance, 32–2–1, Revised Ordinances of Salt Lake City, Utah, 1965, and the material sections of the state laws pertaining to sexual offenses, 76–53–8 through 76–53–12, U.C.A. 1953, reveals that both the city ordinance and state statutes have the common purpose of defeating the practice of business of prostitution or the vice of sexual intercourse for hire and are closely related in subject matter. The mere fact that an act denounced as a crime under the ordinance which is not denounced as a crime under the statute would not necessarily render the act under the ordinance inconsistent with the statute where as here the ordinance is within the scope of the state law dealing with the same related subject of sexual offenses and is in no way repugnant to, but on the other hand is in harmony with the state laws. We believe the ordinance is consistent with the statutes pertaining to sex offenses.

■ As to whether or not the difference of penalties between city ordinances and state statutes on the same subject creates an inconsistency that will invalidate the ordinance receives our next consideration and causes some difficulty. The previous decision in this case stated as follows:

It must be conceded that the legislature did not intend to grant to cities the authority to prohibit acts as misdemeanors which the State has denounced as felonies.

It is stated in 37 Am.Jur., Municipal Corporations, Section 165, p. 791, as follows:

A municipal ordinance is not in conflict with a statute authorizing its adoption because of a difference in penalties. Thus, further and additional penalties may be imposed by statute, without creating inconsistency and conversely, at least in some instances lesser penalties may be imposed by the ordinance for violation than by the statute without conflict. See also annotation, 138 A.L.R. 1208, 1214. McQuillin, Municipal Corporations, Section 17.15, footnote 71, cites cases where it is held that ordinance is valid when it relates to same subject matter as state law where the ordinance prescribed a smaller penalty. In these cases both ordinance and statute are misdemeanors.

Although we do not believe there is anything inherently wrong in allowing a local government to punish conduct amounting to a felony under state law by a municipal ordinance which is only a misdemeanor, nevertheless we do not have to decide this question since the case here involved, under subsections 7 and 8 of the city ordinance, does not amount to a felony under any of the state statutes pertaining to sexual offenses. The elements involved in the present ordinance case would not be the same as under the statute, or if any of the elements were the same or common to both, the statute in a felony case would require proof of additional elements, therefore a claim of double jeopardy would not be valid. Double jeopardy contemplates all the elements of an entire offense. See State v. Thatcher, 108 Utah 63, 157 P.2d 258. We conclude that the difference in penalties does not create an inconsistency that will invalidate the ordinance where there can be no valid claim of double jeopardy.

In summary we conclude that the state has not pre-empted the field of sexual offenses since the ordinance in question is a proper exercise of the police power, and the ordinance is not inconsistent with the state statutes pertaining to sexual offenses.

■ Because of our opinion overruling the pre-emption theory of the first decision it now becomes necessary to consider defendant's contention that subsection 7 of the city ordinance is vague and ambiguous and therefore invalid, which was not necessary to the first opinion because of the pre-emption ruling. Subsection 8 is merely an "aiding and abetting" section to be used in connection with one of the seven subsections and does not concern us on the ground of ambiguity.

Subsection 7 reads as follows:

* * * direct or offer to direct any person to any place or building for the purpose of committing any lewd act or act of sexual intercourse for hire or of moral perversion.

Defendant relies in her contention of vagueness that the two phrases in the subsection 7, namely, "lewd act" and "moral

perversion" are too indefinite and uncertain and therefore render subsection 7 invalid. It will be noted that in said subsection the three phrases, "lewd act," or "act of sexual intercourse for hire," or "of moral perversion," are stated in the alternative and each is a separate and distinct act denounced by the ordinance (the same three phrases are contained in all subsections of the ordinance except subsection 4). Since neither the "lewd act," nor the act "of moral perversion" is before us in this case we express no opinion as to the certainty or uncertainty of such phrases, but leave that question open if a proper case ever comes before this court. As to the phrase denouncing the act of "sexual intercourse for hire" which is before us, we find is such conduct that is sufficiently clear to be understood by persons of ordinary intelligence and is definite and clear, and not ambiguous. We appreciate the fact that defendant did not contend this phrase to be uncertain. See Chief Justice Crockett's concurring opinion in Jones v. Logan City Corp., 19 Utah 2d 169, 428 P.2d 160, and authorities therein cited.

Defendant's conviction is affirmed.

CROCKETT, C. J., and ELLETT, J., concur.

TUCKETT, Justice (dissenting).

I dissent. After carefully considering the main opinion and the legal problems raised by this appeal, I am constrained to adhere to the position taken in the prior opinion of the court.[1] I do not agree that the general grant of police power to the cities by Sec. 10–8–84, U.C.A.1953, was intended by the legislature to authorize adoption of the ordinance we are here concerned with. It would seem that had the legislature intended such broad powers it would not have made specific grants of power to cities to deal with certain aspects of prostitution as provided for by Sec. 10–8–41 and 10–8–51, U.C.A.1953. The latter statutes would be unnecessary and superfluous.

I do not believe the legislature, by use of the term "improve the morals" as contained in Sec. 10–8–84, referred to above, and emphasized in the main opinion, intended that cities be empowered to reduce to the grade of misdemeanor offenses which are denounced as felonies by state statute. Nor do I believe that handling pandering and offenses related thereto on the same basis as traffic violations would in the long-run accomplish the purpose of deterring the acts mentioned in the ordinance.

HENRIOD, Justice (dissenting).

I agree with Mr. Justice Tuckett's dissent here, and with everything he said in the previous case.[1] What he said inoculates logic and enunciation of sound legal principles against the pronouncements of the dissenters in the previous case and the depar-

---

1. Salt Lake City v. Allred, 19 Utah 2d 254, 430 P.2d 371 (1967).

ture therefrom of the new judge appointed to replace one of the members of the majority in the former opinion. Apparently the latter was impelled to refrain from participation in this fatuous case, blown out of all proportion by editorial policy and local TV facility *during the pendency of this case,*—of questionable journalistic propriety in my opinion.

From John Zenger and before, history has convinced me of the necessity for freedom of speech and the press, without which a republic would be meaningless. This freedom includes criticism of what I do or say,—which are facts,—and which facts are the tools that keep the presses oiled and rolling. But I believe even John Zenger would not have claimed a privilege to editorialize in an effort to influence a jury before its deliberations were finalized and before the announcement of its verdict. But that is what appears to have happened in the instant case, where editors appear to have proselyted the public and apparently some of the members of this court by praising the wisdom of the dissenters,—and condemning the majority as having less than adequate legal qualification, and at least of possessing judgment of questionable or immoral propensities,—for some reason locked in the editors' bosoms,—whether to sell papers, or simply demonstrate that the press has sufficient power, (and the last word in rebuttal) to mold the will of the judiciary, —I don't know. Whether right or wrong,

there are they who will say, "That's what happened in this case."

The two dissenters in the former case cast their lot *entirely* under Title 10–8–41, U.C.A.1953. The author of the opinion in the present case pays no attention to those votes, but bases his conclusion *entirely* on Title 10–8–84, U.C.A.1953, and does not assign 10–8–41 as a basis for his conclusion. It would seem to me that this new departure amounts to a dissent from the dissenters. Under such circumstances it seems to be sort of an affirmance, not reversal of the former case.

It was no source of great comfort to me to see in print, going out to thousands of readers, while this case still was pending, a rather cheap cartoon, libelous in nature, depicting a couple of fag-fuming females, ladies of the pavement, as it were, grinning at a book labeled "Supreme Court Decision—Prostitution No Crime In Utah," with a headline saying, "I'll say this for the Supreme Court—they make a girl feel like a lady." Nor did it make my day any brighter when this same newspaper, before this case finally was decided, editorialized that, "It is obvious that the Supreme Court erred in this case," that the opinion was "ill-advised," that "To wipe away all such local ordinances, as the Supreme Court has wiped away local prostitution, would result in chaos," (which obviously is an inaccurate statement, as Mr. Justice Tuckett's opinion clearly demonstrates), and to be sufficient-

ly omniscient as to say, "We have confi-dence they (the majority) are big enough men to acknowledge the possibility of error and to give this matter another look," and then to hammer the last nails, so to speak, into the hands of the triumvirate of the majority, to further editorialize that, "The Supreme Court *is now reconsidering its decision. Hopefully, it will reverse itself."* Fait accompli, and touche. (Emphasis added.)

Now, sending the printer's devil home, let's take a look at the facts and law in this case: In the former case Mr. Justice Tuckett simply said what every lawyer should know, that cities cannot exercise powers not delegated to them by the state or its constitution. He just as soundly and fundamentally said that the subject ordinance (32–1–1) was an attempt to exercise a power. not so delegated. So saying, he used what his critics, with some sort of apparent delight, considered to be a nasty,—or should I say "meretricious" word:[2] "pre-empt." I am convinced that under the authorities, the use of that word was accurate, albeit

distasteful to some. Had he said that those powers not specifically delegated to cities are "reserved" to the state, the beehive probably would have been quiescent. Mr. Justice Tuckett then very carefully and just as judiciously pointed out that, notwithstanding the attempt of the City to exercise a power not delegated to it, nonetheless, *and* specifically, *and* under Titles 10–8–41 and 10–8–51, U.C.A.1953, it had plenary power and authority, respectively to: 1) suppress houses of ill repute for purposes of prostitution and 2) to provide for punishment of prostitutes. What more could a city ask for by way of coping with the pursuits of the oldest profession in the world? These rather extensive grants of power have persisted through the polygamy, "Commercial Street," stockade and fancy hotel eras. I believe that if such existing ordinances were enforced with any degree of common sense, the situation effectively could be handled without resort to this "Johnnie-Come-Lately" (1963) vague, ambiguous, entrapment, pandering ordinance,[3] undelegated to cities by the state.

2. It is interesting to note that, while this case was still hanging fire, it was noted editorially that Salt Lake City had passed a new ordinance to cope with the "shameful parade" of West 2d South prostitutes. It failed to point out in the editorial that the legal draftsmen of the ordinance condemned the "meritorious" instead of "meretricious" display,—which lends some credence to the idea that the ordinance is vague, and that lawyers like many others may not know the meaning of the terms, or don't know how to spell.

3. It is interesting to note the zealous plea of counsel for the City that "The expensive hotels, apartments and motels have replaced the bawdy houses of assignation and houses of prostitution of yesteryear which were commonly known and designated as such in restricted areas *often protected by public officials."* (Emphasis added.) One wonders why, having such information, the City Attorney doesn't name these "expensive hotels, apartments and motels," some of which are situated within the shadows

**306**

The subject ordinance (32–2–1) not only is constitutionally unpalatable, but is such as easily could lead to results antithetical to the laudable motives claimed for it.

It is unconstitutional because, as Mr. Justice Tuckett so clearly stated in his opinion, the authority sought to be employed,— that of punishing pandering (76–53–8) and profiting from earnings of fallen women (76–53–10), has been "reserved" to the state, or "pre-empted" by the state, whichever synonym one cares to employ. There is great wisdom displayed on the part of the legislature in reserving such power to the state, since the violation of either of the chapters cited above, is a *felony*, and respectively calls for up to 20 years in prison, for pandering, and from two to 20 years in prison for profiting by the earnings of fallen women, where, among other things, the malefactor is subject to 20 years' imprisonment for "keep[ing] a list of female persons to call or to be called for the purpose of prostitution." This is exactly what this ordinance, the destruction of which worries Justices Ellett, Crockett, and now Judge Cowley, and some editors, proposes to do, with but a small fine or jail sentence. It would occur to me that Mr. Justice Ellett's comment in his dissent in the former case that "I cannot think of a

better way to prohibit the keeping of disorderly houses than to dry up the sources of revenue" (under the ordinance, 32–2–1, which is a misdemeanor ordinance), better would have been employed in a concurrence with Mr. Justice Tuckett.

I can think of a much better way to dry up the source of revenue, and that is to dry up the *true* source of revenue, i. e., panderers and those profiting by the earnings of fallen women, by prosecuting them, not under a misdemeanor ordinance, such as 32–2–1 calling for a small fine or jail sentence, but under state statutes 76–53–8 and/or 76–53–10, calling for up to 20 years. If such procedure under the state statutes were effectively employed and those statutes enforced, my humble prognostication is that the source of revenue would dry "up" in a jet plane, and there would be an exodus post haste of procurers and their charges, that the majority of this court appears to have been charged editorially by word and cartoon of seeking to "court."

It seems perfectly sensible to me that the legislature should authorize cities 1) to suppress houses of ill repute (10–8–41. U. C.A.) and 2) punish prostitutes, (10–8–51) under misdemeanor penalties, reserving to the state the authority to punish as felony, with a greater penalty, the much more

of the temples, dust off existing ordinances, or pass one and prosecute them if they be guilty, as they did Allred, under the authority of Title 10–8–41 and 10–8–51, U.C.A.1953. Such gratuity on

the part of counsel for the City, is almost as profound a pronouncement stated in its brief that, "A male person is most definitely singular and incapable of being construed in the plural sense."

heinous crimes of encouraging and imprisoning women for sex purposes, and taking a cut in the take. It seems that this is the very reason why the state also reserved authority to punish more severely than would be the case of a misdemeanor, the crimes of adultery (76–53–2, U.C.A.), incest (76–53–4), placing one's wife in a house of prostitution (76–53–9), detaining a female in a house of prostitution for debts incurred (76–53–11), transporting females for prostitution (76–53–12), and sodomy (76–53–22). Others could be enumerated. If Mr. Justice Tuckett's opinion be "unreason," then give me liberty or give me death, —or a Linotype machine.

The ordinance is so vague as to have led the drafters of its successor to use the word "meritorious" rather than "meretricious." I would appreciate it if someone could tell the average legendary "reasonable, prudent man" when he has committed a "meretricious" act,—or "meritorious" act for that matter. "Meretricious" has so many synonymic or pseudonimic kinfolk as to make the word, if not understandable, at least misunderstandable. The venerable Webster, who did not edit the work now commercialized by use of his name, of course doesn't know that "meretricious," besides having to do with prostitution also is defined as "alluring with false show," "gaudily and deceitfully ornamental" and "tawdry." The miniskirt or bikini might subject one to penalty as being "meretricious" by

some judge or jury that thinks the wearer didn't hew to the hemline. The same line of reasoning could attach to "lewd," as generalized in the ordinance, which may be characterized by some to apply to the bikini or miniskirt, but by others as a simple, artistic modeling of the body beautiful. The Venus de Milo, if living, could get a few months in jail and a fine under this fine ordinance in displaying her armless or harmless self for the sculptor who fashioned her. Who knows what is meretricious under this ordinance,—the saint or the sinner? I have never heard of a church organist being prosecuted for an ogle-eyed stare, with a suggestive nod of the head directed toward the vicar.

The payoff comes in subsection 8 of the ordinance, which makes it a crime to "aid, abet, allow, permit, or participate in the commission of any of the acts prohibited in subsections one through seven above." Under this subsection, let the person beware who is asked, "Where can I get a girl," (or for that matter, a call-girl) who responds by saying, "See the taxi driver, the bellhop, the bartender, the upstairs maid, or somebody,—I'm not sure." Let him who knows that somebody seeks in the way of female companionship "refuse" to prevent the latter from doing so or even "Allow" him to do it. He would be guilty under the vagaries of this unnecessary ordinance, which appears to me to be an excrescence on reasonable law enforcement.

He would be guilty if he "permitted" one to go to a place of ill repute, under this ordinance. Surely there must be something in the English language that could tell a reasonable person what, if he did it, could toss him in jail, more sensibly than this, and I repeat, fatuous ordinance.

Under this ordinance, with its loose, ambiguous language, there is no reason why the police officer here, the real solicitor of the information, should not be charged and convicted first, since he most certainly "aided and abetted" before Allred did, and who solicited nothing. In the officer's solicitation of Allred for information about some "lewd woman" or "meretricious" female who has not been shown to be lewd, meretricious or solicitous herself, is nothing short of entrapment,—with the wrong punishee,—the person who gave the information that presumably would help the officer to help punish prostitutes,—an informant's tip,—which informant now knows that he or she will go to jail under this stupid ordinance rather than the person sought to be suppressed and punished, —the prostitute. Allred, cab drivers, bartenders, bellboys and even managers of the so-called "expensive hotels, apartments and motels," being a possible fruitful source of information to peace officers, will, after the approval of the ordinance by this court, clam up because the solicitor for information may be a policeman and the solicitee will take no chances on incarceration when his so-called benefactor turns against him and in turn informs against the informer. This is a dandy way to justify Mr. Justice Ellett's thesis of drying up the source of revenue. What this ordinance does is to *dry up the source of information and increase the source of revenue.* Why the present local police administrators, including the city commissioners, cannot see the practical aspects of this conclusion, I don't know. The flowery words of counsel for those people in this case impress me not when they say, "It would appear *too clear for argument that the spread of loathsome venereal diseases can in large measure be attributed to prostitution and sex acts for hire. The prohibition against the commission of an act of sexual intercourse for hire has the beneficial double effect of preventing both it * * * and the spread of communicable disease.* (Emphasis added.) Let's pass an ordinance against kissing. One will get that author five that there is a greater spread of venereal disease by copulation "for free" or "for free flower love" than there is "for hire,"—in some considerable measure contributed to by teenagers, in and out of high school, college-age students, old goats, bachelors, married persons, and even churchgoers. One will get him also five if he can demonstrate to me or anyone else that during the four or five-year life of the ordinance in question there was a reduction in the venereal rate in Salt Lake City. In the "yesteryear" he talks about, where he says the houses of ill fame were "often protected by

public officials," I would like to know, not only *which* public officials, but what the statistics on the incidence of venereal disease show as compared to those during the period this ordinance has been in existence, and one will get him another five if he can show it to be greater during the "yester-year" era. Now that this court has placed the stamp of approval on this ordinance, I expect to have the semantics of counsel for the City and the misnomered amicus curiae vindicated by a glowing report in this "tomorrow year" of a substantial reduction in that incidence,—not an increase in municipal revenue on account of the now respected ordinance and its virtue,—or lack of it.

In passing I wish to comment on the "flower" reference of counsel for the re-hearing people, who quoted me as saying, "In the nature of things I accept the decisions of the Supreme Court, but reserve the right, until bondage '*pre-empts*' [emphasis added] it, to criticize them. I reserve to the citizens of my state the same privilege with respect to my opinions." [4] This seems to have been meant as some sort of aspersion to what he thinks was a stupid concurrence with Mr. Justice Tuckett's opinion. Be that as it may, I am prepared to and do affirm that quotation, *with emphasis,*—but I did not have in mind the situation where both the City's counsel and the news media mentioned did the criticizing before the jury returned with its verdict.

This ordinance should be declared unconstitutional, with "hopeful" "confidence that they are big enough men to acknowledge the possibility of error, and to give this matter another look." The two dissenters here have given the matter another look and do not intend to depart from our honest convictions.

In saying all this, I must conclude that I believe the editorials mentioned were not inspired of malice, and I am satisfied that those who penned them are honest people, dedicated to their profession, as are the participating lawyers in this case. I may be doing the same thing that I criticize others of doing. Candidly, nonetheless and mayhap erroneously, I lend some credence to my belief that possibly there may be 1) an impulse editorially to over-emphasize in a conceded sensitive area of law enforcement, and 2) the desire on our part to defend the integrity of this court,—whose record, I think will stand the test of public scrutiny. I haven't cancelled my subscription and don't intend to, and hope that others will not cancel their subscriptions to our decisions because of what we say,—and as for me, if this be "unreasonable, give the press liberty or death,"—or the not always pleasant chore in arriving at decisions we individually arrive at after an honest appraisal of the facts and the law thereto applicable.

CALLISTER, J., not participating.

4. State v. Louden, 15 Utah 2d 64, 387 P.2d 240.