The STATE of Utah, Plaintiff
and Appellant,

v.

William L. HUTCHINSON, Defendant
and Respondent.

No. 16087.

Supreme Court of Utah.

Dec. 9, 1980.

Robert B. Hansen, Atty. Gen., R. Paul Van Dam, former Salt Lake County Atty., Salt Lake City, for plaintiff and appellant.

Phil L. Hansen of Hansen & Hansen, Salt Lake City, for defendant and respondent.

STEWART, Justice:

Defendant, a candidate for the office of Salt Lake County Commissioner, was charged with having violated § 1–10–4, Revised Ordinances of Salt Lake County, which requires the filing of campaign statements and the disclosure of campaign contributions. That section provides:

Campaign Statements.

1. Every candidate for election or his designated committee secretary shall file with the county clerk on forms furnished by the clerk, full, correct and itemized statements of all monies and things of monetary value received and expended in the furtherance of said candidacy in accordance with the schedule set forth in this section.

*　　*　　*　　*　　*　　*

5. All statements shall be dated and signed by the candidate and the committee secretary.

Failure to comply with those provisions is a misdemeanor.

A complaint charged defendant in two counts: (1) failure to report the name and address of a $6,000 contributor to his election campaign, and (2) failure to file supplemental campaign disclosures of the discharge of campaign debts and obligations.

Defendant filed a motion in a city court to dismiss the complaint on the ground that the ordinance was in violation of the Utah Constitution. The court granted the motion and held that Salt Lake County was without constitutional or statutory authority to enact the ordinance under which defendant was charged and dismissed the complaint.

An appeal was taken to a district court which affirmed the dismissal. That court wrote a memorandum decision observing that "... it may be true that our Utah Supreme Court has not been completely consistent in every case on this issue, [but] the majority of the [Utah Supreme Court] cases have indicated that grants of powers

to cities or counties are to be strictly construed to the exclusion of implied powers not reasonably necessary in carrying out the purposes of the expressed powers granted." The court noted that, on the other hand, *Salt Lake City v. Kusse*, 97 Utah 113, 93 P.2d 671 (1938), and *Salt Lake City v. Allred*, 20 Utah 2d 298, 437 P.2d 434 (1968), "suggest that a county has fairly broad power to enact ordinances ... under the general welfare clause of § 17–5–77 [Utah Code Annotated.]" Nevertheless, the court held that there is no express authority in state statutes authorizing the enactment of § 1–10–4 and that there was nothing that could be "implied from any express power that would justify the enactment of these ordinances." Accordingly, the court held the ordinance unconstitutional, and the State appeals.[1]

Defendant contends that because the Legislature has not specifically authorized counties to enact ordinances requiring disclosure of campaign contributions in county elections, Salt Lake County had no power to enact the ordinance in question. Alternatively, defendant contends that the ordinance is invalid because state statutes have preempted the field of regulation.

Concededly, the district court was correct in holding that the Legislature has not expressly authorized enactment of an ordinance requiring disclosure of campaign contributions in county elections. However, the Legislature has conferred upon cities and counties the authority to enact all necessary measures to promote the general health, safety, morals, and welfare of their citizens. Section 17–5–77, U.C.A. (1953), as amended, provides:

> The board of county commissioners may pass all ordinances ... not repugnant to law ... *necessary and proper to provide*

*for the safety, and preserve the health, promote the prosperity, improve the morals, peace and good order, comfort and convenience of the county and the inhabitants thereof, ...* and may enforce obedience to such ordinances ... by fine in any sum less than $300 or by imprisonment not to exceed six months, or by both such fine and imprisonment .... [Emphasis added.]

The Legislature has made a similar grant of power to the cities.[2]

The specific issue in this case is whether § 17–5–77 by itself provides Salt Lake County legal authority to enact the ordinance for disclosure of campaign contributions, or whether there must be a specific grant of authority for counties to enact measures dealing with disclosures of campaign financing to sustain the ordinance in question. Defendant claims that the powers of municipalities must be strictly construed and that because Salt Lake County did not have specific, delegated authority to enact the ordinance in issue, the ordinance is invalid.

The rule requiring strict construction of the powers delegated by the Legislature to counties and municipalities is a rule which is archaic, unrealistic, and unresponsive to the current needs of both state and local governments and effectively nullifies the legislative grant of general police power to the counties. Furthermore, although the rule of strict construction is supported by some cases in this State, it is inconsistent with other cases decided by this Court—a situation that permits choosing between conflicting precedents to support a particular result.

Dillon's Rule, which requires strict construction of delegated powers to local

---

1. This Court has jurisdiction of this appeal pursuant to Article VIII, § 9 of the Utah Constitution.

2. Section 10–8–84 provides:
 They may pass all ordinances and rules, and make all regulations, not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this

chapter, and such as are necessary and proper to provide for the safety and preserve the health, and promote the prosperity, improve the morals, peace and good order, comfort and convenience of the city and the inhabitants thereof, and for the protection of property therein ....

governments, was first enunciated in 1868.[3] The rule was widely adopted during a period of great mistrust of municipal governments[4] and has been viewed as "the only possible alternative by which extensive governmental powers may be conferred upon our municipalities, with a measurable limit upon their abuse."[5]

The courts, in applying the Dillon Rule to general welfare clauses, have not viewed the latter as an independent source of power, but rather as limited by specific, enumerated grants of authority. See, e. g., *American Fork City v. Robinson*, 77 Utah 168, 292 P. 249 (1930); *Salt Lake City v. Sutter*, 61 Utah 533, 216 P. 234 (1923). More recently, however, reasoned opinion regarding the validity of the rule has changed. One authority has noted the harmful effects that the rule of strict construction has had upon the effective exercise of appropriate municipal authority:

Any vestige of inherent powers or liberality in construing delegated powers was soon swept away by the Dillon Rule. This rule was formulated in an era when farm-dominated legislatures were jealous of their power and when city scandals were notorious. It has been the authority, without critical analysis of it, for literally hundreds of subsequent cases.

As it arose, the strict construction doctrine applied to municipal corporations but it has been extended to local government generally and it must be faced in any approach to liberalizing local powers. This rule sends local government to State legislatures seeking grants of additional powers; it causes local officials to doubt their power, and it stops local governmental programs from developing fully. The strict construction rule stimulated home rule efforts and is largely responsible for the erosion of home rule. Because of its importance the rule should be examined critically from time to time. [Footnotes omitted.][6]

---

**3.** In *Merriam v. Moody's Executors*, 25 Iowa 163, 170 (1868), Judge Dillon stated:

[I]t must be taken for settled law, that a municipal corporation possesses and can exercise the following powers and no others: First, those granted in express words; second, those necessarily implied or necessarily incident to the powers expressly granted; third, those absolutely essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable; fourth, any fair doubt as to the existence of a power is resolved by the courts against the corporation—against the existence of the power.

Dillon's Rule has been widely applied to municipal corporations, including counties. Even though a county is not a municipal corporation in its strict sense, McQuillin, *Municipal Corporations* §§ 2.46 and 2.46a (3rd ed. 1971), it is often characterized as a quasi-municipal corporation and as such falls within the broad definition of municipal corporations, *id.* at §§ 2.07–2.07b. Counties in this State have been characterized as quasi-municipal corporations by this Court in *Shaw v. Salt Lake County*, 119 Utah 50, 224 P.2d 1037 (1950); they therefore fall within the general scope of municipal corporations for purposes of the Dillon Rule. For the reasons stated herein, we expressly abandon the rule of strict construction of municipal and county powers insofar as it has heretofore had a basis in Utah law.

**4.** J. F. Dillon, *Municipal Corporations* § 238 (5th ed. 1911). The author quoted the following language from *Spaulding v. Lowell*, 23 Pick. (40 Mass.) 71, 75:

"In aggregate corporations, as a general rule, the act and will of a majority is deemed in law the act and will of the whole ... as the act of the corporate body. The consequence is, that a minority must be bound, not only without, but against their consent. Such obligation may extend to every onerous duty, to pay money to an unlimited amount, to perform services, to surrender lands, and the like. It is obvious, therefore, that if this liability were to extend to unlimited and indefinite objects, the citizen, by being a member of a corporation, might be deprived of his most valuable personal rights and liberties. The security against this danger is in a steady adherence to the principle stated, *that corporations can only exercise their powers over their respective members, for the accomplishment of limited and well defined objects.* [Emphasis added.]

**5.** Tooke, *Construction and Operation of Municipal Powers*, 7 Temple L.Q. 267, 273–74 (1933).

**6.** Advisory Commission on Intergovernmental Relations, State Constitutional and Statutory Restrictions Upon the Structural, Functional, and Personnel Powers of Local Government, 24 (1962) (hereinafter cited as Advisory Commission).

As pointed out in Frug, *The City As A Legal Concept*, 93 Harvard L.Rev. 1059, 1111 (1980):

> Most troubling of all to Dillon, cities were not managed by those "*best fitted* by their intelligence, business experience, capacity and moral character." Their management was "too often both *unwise* and *extravagant*." A major change in city government was therefore needed to achieve a fully public city government dedicated to the common good. [Footnotes omitted.] [Emphasis in original.]

If there were once valid policy reasons supporting the rule, we think they have largely lost their force and that effective local self-government, as an important constituent part of our system of government, must have sufficient power to deal effectively with the problems with which it must deal. In a time of almost universal education and of substantial, and sometimes intense, citizen interest in the proper functioning of local government, we do not share the belief that local officials are generally unworthy of the trust of those governed. Indeed, if democratic processes at the grassroots level do not function well, then it is not likely that our state government will operate much better. Frug further states:

> The most extensive rebuttal to Dillon was published in 1911 by Eugene McQuillin in his multivolume treatise, *The Law of Municipal Corporations*. In an exhaustive survey, McQuillin traced the historical development of municipal corporations and found the essential theme to be a right to local self-government. He rejected the suggestion that cities were created by the state, arguing that "[s]uch [a] position ignores well-established, historical facts easily ascertainable." McQuillin strongly criticized courts that failed to uphold the right of local self-government:

> The judicial decisions denying the right of local self-government without express constitutional guaranty, reject the rule of construction that all grants of power are to be interpreted in the light of the maxims of Magna Carta, or rather the development of English rights and governmental powers prior to that time; that is, the common law

transmuted into our constitutions and laws. They ignore in toto the fact that local self-government does not owe its origin to constitutions and laws. . . . They disregard the fact that it is a part of the liberty of a community, an expression of community freedom, the heart of our political institutions. They refuse to concede, therefore, that it is a right in any just sense beyond unlimited state control, but rather it is nothing more than a privilege, to be refused or granted in such measure as the legislative agents of the people for the time being determine. [Footnotes omitted.] [*Id.* at 1113–14.]

The Utah territorial court referred to the Dillon Rule as early as 1881 in *Levy v. Salt Lake City*, 3 Utah 63, 1 P. 160 (1881). It has been applied in numerous cases since that time, e. g., *Layton City v. Speth*, Utah, 578 P.2d 828 (1978); *Utah Rapid Transit Co. v. Ogden City*, 89 Utah 546, 58 P.2d 1 (1936); *American Fork City v. Robinson*, 77 Utah 168, 292 P. 249 (1930); *Salt Lake City v. Sutter*, 61 Utah 533, 216 P. 234 (1923). In *Nance v. Mayflower Tavern*, 106 Utah 517, 150 P.2d 773 (1944), the Court stated:

> To determine whether or not a city has the power to enact any particular ordinance the court must look to the legislative grant of power and to the Constitution of the State of Utah. *If there is a reasonable doubt concerning the existence of a particular power, that doubt should be resolved against the city, and the power should be denied.* [Emphasis added.] [106 Utah at 520; 150 P.2d at 774.]

See also *Parker v. Provo City Corporation*, Utah, 543 P.2d 769 (1975).

But the Court has also ignored the rule on occasion without attempting to distinguish it or overrule it. For instance, in *Salt Lake City v. Doran*, 42 Utah 401, 131 P. 636 (1913), and *City of Ogden City v. Crossman*, 17 Utah 66, 53 P. 985 (1898), specific grants of power were given broad interpretation

by the court; and in *Hargraves v. Young*, 3 Utah 2d 175, 280 P.2d 974 (1955), the upholding of a municipal ordinance required both a broad interpretation of a specific grant of power, as well as reliance on the general welfare clause. See also *Salt Lake City v. Howe*, 37 Utah 170, 106 P. 705 (1910), and *Rupp v. Grantsville City*, Utah, 610 P.2d 338 (1980), in which the court relied on the general welfare clause for upholding a city ordinance and, without discussing the issue, broadly construed that clause.

The fear of local governments abusing their delegated powers as a justification for strict construction of those powers is a slur on the right and the ability of people to govern themselves. Adequate protection against abuse of power or interference with legitimate statewide interests is provided by the electorate, state supervisory control, and judicial review. Strict construction, particularly in the face of a general welfare grant of power to local governments, simply eviscerates the plain language of the statute, nullifies the intent of the Legislature, and seriously cripples effective local government.

■ There are ample safeguards against any abuse of power at the local level. Local governments, as subdivisions of the State, exercise those powers granted to them by the State Legislature, *Ritholz v. City of Salt Lake*, 3 Utah 2d 385, 284 P.2d 702 (1955), and the exercise of a delegated power is subject to the limitations imposed by state statutes and state and federal constitutions. A state cannot empower local governments to do that which the state itself does not have authority to do. In addition, local governments are without authority to pass any ordinance prohibited by, or in conflict with, state statutory law. *Salt Lake City v. Allred*, 20 Utah 2d 298, 437 P.2d 434 (1968). Also, an ordinance is invalid if it intrudes into an area which the Legislature has preempted by comprehensive legislation intended to blanket a particular field.

In view of all these restraints and corrective measures, it is not appropriate for this Court to enfeeble local governments on the unjustified assumption that strict construction of delegated powers is necessary to prevent abuse. The enactment of a broad general welfare clause conferring police powers directly on the counties was to enable them to act in every reasonable, necessary, and appropriate way to further the public welfare of their citizens.

The ultimate limitation upon potential abuses by local governments is the people themselves. It is their vigilance and sound judgment by which all democratic governments in the end, are restricted and directed. Officials who abuse the powers with which they have been entrusted ought not to be, and usually are not, long tolerated.

In short, we simply do not accept the proposition that local governments are not to be trusted with the full scope of legislatively granted powers to meet the needs of their local constituents. On the contrary, the history of our political institutions is founded in large measure on the concept—at least in theory if not in practice—that the more local the unit of government is that can deal with a political problem, the more effective and efficient the exercise of power is likely to be.

This view is shared by the Advisory Commission on Intergovernmental Relations which has urged that local governments be given broad powers, Advisory Commission, *supra*, n. 6, at 72. The Commission's Report states:

> The Commission believes that legislatures should delegate local powers in broad terms. The abuse by local government of broad powers troubles the Commission minimally. It is not currently widespread in any serious way. The fact that abuse conceivably might occur is no more reason to deny broad delegations of power than it is to deny a Boy Scout a knife because he might cut himself. Additionally, we are of the opinion that if a broad functional delegation of power is a part of the total power residing in the local governing body it will be more responsive to popular control. [*Id.*]

The wide diversity of problems encountered by county and municipal governments are not all, and cannot realistically be, effectively dealt with by a state legislature which sits for sixty days every two years to deal with matters of general importance. Thus the manner in which the Legislature operates militates in favor of a rule of judicial construction which permits localities to deal with their problems by local legislative action.

The general welfare provision, § 17–5–77, grants county commissioners of each county two distinct types of authority. In the first instance, power is given *to implement specific grants of authority.* Second, the counties are granted *an independent source of power to act for the general welfare of its citizens.* Thus § 17–5–77 provides authority to "pass all ordinances and rules and make all regulations, not repugnant to law, necessary for carrying into effect or discharging the powers and duties conferred by this title . . . ." The second part of that section empowers counties to pass ordinances that are "necessary and proper to provide for the safety, and preserve the health, promote the prosperity, improve the morals, peace and good order, comfort and convenience of the county and the inhabitants thereof, and for the protection of property therein."

Nothing in § 17–5–77 or in Title 17 suggests that the general welfare clause should be narrowly or strictly construed. Its breadth of language demands the opposite conclusion. Moreover, the Constitution does not allow the Legislature unlimited discretion to deal with local government. The broad delegation of power by the Legislature to the counties is consistent with constitutional provisions which establish counties as governmental entities and place certain aspects of county government beyond the power of the Legislature. Article XI, § 1 gives constitutional status to the counties as they existed at the time of adoption of the Constitution, and they are "recognized as legal subdivisions of this State . . . ." Sections 2 and 3 of that article restrict the Legislature with respect to the changing of county seats and county lines. In addition, it should be noted that charter cities have been endowed with even more wide-ranging powers by Article XI, § 5 of the Constitution.[7] See also Article I, § 25 which provides that those rights enumerated in the Constitution "shall not be construed to impair or deny others retained by the people."

The grant of general welfare power to counties is duplicated by a similar grant to the cities, and this Court has on several occasions squarely sustained city ordinances solely on the basis of the general welfare clause. *Layton City v. Glines,* 616 P.2d 588 (1980); *Salt Lake City v. Allred,* 20 Utah 2d 298, 437 P.2d 434 (1968); *Salt Lake City v. Kusse,* 97 Utah 113, 93 P.2d 671 (1938). Compare *Rupp v. Grantsville City,* Utah, 610 P.2d 338 (1980). But see *Layton City v. Speth,* Utah, 578 P.2d 828 (1978), in which the Court struck down an ordinance on a narrow construction of the general welfare clause and a specific legislative grant of power.

In *Allred* the defendant was convicted of violating a Salt Lake City ordinance by directing a police officer to a location where he could obtain sexual intercourse for hire. This Court did not deem it necessary to address the issue of whether express statutory grants of authority were sufficient to empower municipal governments to pass the ordinance in question. Rather, in upholding the conviction, the court stated: "We are of the opinion that the general police power is a sufficient grant of authority to authorize the city ordinance involved

---

**7.** Section 5 of Article XI provides for a charter form of government for municipal corporations. It expressly states that each city which forms a charter is granted the authority to exercise all powers relating to municipal affairs, and to adopt and enforce within its limits, local police, sanitary and similar regulations not in conflict with the general law, and no enumeration of powers in this Constitution or any law shall be deemed to limit or restrict the general grant of authority hereby conferred . . . .

in this case . . . ." 20 Utah 2d at 300, 437 P.2d at 436.[8]

In *Kusse, supra,* the defendant was convicted under a Salt Lake City ordinance which prohibited driving while under the influence of intoxicating liquor. In responding to the defendant's claim that the City did not have authority to pass the ordinance, the City argued that the authority had been granted under two statutory provisions: first, a statute providing that a municipality could "regulate the movement of traffic on the streets, sidewalks and public places, including the movement of pedestrians as well as of vehicles," R.S.U. § 15–8–30 (1933); and second, a grant to enact ordinances in furtherance of the general welfare, R.S.U. § 15–8–84 (1933). This Court held that the City had authority under the general welfare provision to pass the ordinance. The Court stated:

> There may be some question whether Sec. 15–8–30 [the power to regulate the movement of traffic] does not pertain only to the regulation of the actual movement of traffic and the actual prevention of racing and immoderate driving; that is, whether the section permits only the operation on these acts as they occur without giving power to prevent an act or a condition which itself, if permitted, might affect the movement of traffic or be likely to result in racing or immoderate driving. While this seems a narrow construction, it need not now be decided because we think Section 15–8–84, R.S.U. 1933, [the general welfare power provision] definitely permits the city to pass an ordinance to prevent driving while under the influence of intoxicating liquors. [97 Utah at 116, 93 P.2d at 672.]

Particularly relevant here are those decisions by this Court upholding county ordinances which, in the absence of specific legislative grants of power, derived their authority solely from a grant of general welfare power. *Peck v. Dunn,* Utah, 574 P.2d 367 (1978), cert. denied 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978); *Buhler v. Stone,* Utah, 533 P.2d 292 (1975).

A recent case decided by this Court, *Call v. City of West Jordan,* Utah, 606 P.2d 217 (1979),[9] also ignored the rule of narrow construction of city powers. The issue at stake was whether the City of West Jordan had the power to require subdividers to dedicate seven percent of the land area of a prospective subdivision to the public for the use and benefit of the citizens of the City of West Jordan, or in the alternative, the equivalent value of land in cash. This provision was sustained under power delegated to cities by § 10–8–84, a grant of general welfare power, as well as other statutory provisions dealing with the general subject of planning and zoning, but none of which conferred any authority upon a municipality to require a payment in kind or cash for the "benefit and use of the citizens" of a city. *City of West Jordan* did not discuss or attempt to reconcile conflicting cases dealing with Dillon's Rule, but that case is in harmony with the results reached in *Allred* and *Kusse, supra.*

These decisions are consistent with our basic framework of government. This Court in *State v. Standford,* 24 Utah 148, 66 P. 1061 (1901), stated:

> [T]he Constitution implies a right of local self-government to each county, and a right to establish a system of county government is expressly recognized and enjoined. The power is given to create the county government, not to administer to such a system when created. The right of the Legislature was to provide for and put in action, not to run and operate, the machinery of the local government to the disfranchisement of the people. *People v. Hurlbut,* 24 Mich. 44, 9 Am.Rep. 103. When the county government is established separate from

8. This case was decided on rehearing. In the prior opinion, *Salt Lake City v. Allred,* 19 Utah 2d 254, 430 P.2d 371 (1967), the ordinance was held to be *ultra vires.*

9. Rehearing was granted on March 6, 1980, in *Call v. City of West Jordan* but was limited to the constitutional issue of whether the dedication constituted an unconstitutional taking of property [614 P.2d 1257 (1980).]

the state, each is compelled to bear its own burdens, and not assume those of the other. [24 Utah at 158–59, 66 P. at 1062.]

The reason for providing appropriate protection for local government was stated in *State v. Eldredge*, 27 Utah 477, 76 P. 337 (1904): [10]

The fact is that every provision of the Constitution relating to this important subject appears to manifest an intention to bring those through whom power is to be exercised as close as possible to the subjects upon whom the power is to operate—to preserve the right of local self-government to the people, and to restrict every encroachment upon such right. And, as has been seen, this is in harmony with history, with our American constitutional law, with our notions of decentralization of power, and with the spirit and genius of our institutions. [27 Utah at 485, 76 P. at 340.]

More recently, this Court, in accord with that philosophy, has expressly held a reasonable latitude of judgment and discretion is essential for a county commission to exercise its express and implied powers. *Gardner v. Davis County*, Utah, 523 P.2d 865 (1974); *Cottonwood City Electors v. Salt Lake County Board of Comm'rs*, 28 Utah 2d 121, 499 P.2d 270 (1972).

The courts of other states have also held that a general welfare clause confers power in addition to and beyond that granted by specific statutory grants. *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 130 Cal. Rptr. 465, 550 P.2d 1001 (1976); *Leavenworth Club Owners Assoc. v. Atchison*, 208 Kan. 318, 492 P.2d 183 (1971); *City of Duluth v. Cerveny*, 218 Minn. 511, 16 N.W.2d 779 (1944); *Lehrhaupt v. Flynn*, 140 N.J.Super. 250, 356 A.2d 35 (1976); *City of Hobbs v. Biswell*, 81 N.M. 778, 473 P.2d 917 (1970); *Krolick v. Lowery*, 32 A.D.2d 317, 302 N.Y. S.2d 109 (1969); *Adams v. City of New Kensington*, 357 Pa. 557, 55 A.2d 392 (1947); *City of Pasco v. Dixson*, 81 Wash.2d 510, 503 P.2d 76 (1972).

A leading authority in local government law asserts that this is the majority rule. McQuillin in *Municipal Corporations* states:

Municipal corporations ordinarily are empowered by charter or statute, after enumeration of their specific powers, to do any act, exercise any power and render any service which contributes to their general welfare, good government, good order, or the like. A provision of this character usually is called a general wel-

---

10. See also *Garel v. Board of County Commissioners of the County of Summit*, 167 Colo. 351, 447 P.2d 209 (1968), which stated:

We do not disagree with the rule ... that counties possess only such powers as are expressly delegated to them. We are of the opinion, however, that the requirement of an express delegation of power does not preclude it from being made in general terms. The legislature may delegate authority in general terms without running afoul of the constitution. In *Hazlet v. Gaunt*, 126 Colo. 385, 250 P.2d 188, this court upheld the School District Reorganization Act of 1949 in the face of an attack upon it that it permitted an unconstitutional delegation of legislative power. In upholding the act we quoted the following from 16 C.J.S. Constitutional Law § 138:

The legislature is not required to legislate for the guidance of executive agencies further than is practicable, and, if the circumstances require, may express the policy or standard in merely general terms.

 * * * * * *

Counties in this day and age are required to undertake innumerable services for [their] citizens. It would place an unwarranted burden upon the legislature to specify each and every service which the designated governmental entity may lawfully undertake. As stated in C. Rhyne, Municipal Law § 4–8 (1957):

The state legislature, in order to obviate the difficulty of making specific enumeration of all powers it intends to delegate to the municipality, usually confers some power in general terms. Home rule charter enactments or amendments may be couched in the most general terms. The purpose of the general welfare clause in a statute is to extend the powers of a municipality beyond those specifically enumerated to other things which are necessary to accomplish the purposes of municipal government. Special charters are often concluded with a clause conferring general authority to pass all ordinances which may be necessary for the promotion of the health, safety and welfare of the municipality which are not in conflict with the constitution or general laws of the state. [447 P.2d at 210–11.]

fare or general grant of power clause. Under it ordinances may be passed which are necessary and beneficial, and they will be adjudged valid by the courts, provided they are reasonable and consonant with the general powers and purposes of the local corporation, and not inconsistent with the United States Constitution, treaties, and statutes, and the laws and policy of the state.

The exercise of power conferred by a general welfare or general grant of power clause must be exercised by a municipal corporation, as a general rule, through an ordinance or other form of legislative enactment.

 \* \* \* \* \* \*

A general welfare or similar clause, granting extremely broad power to a municipal corporation, is liberally construed to accord to a municipality wide discretion in the exercise of the police power. The cases, indeed, reveal an increasing judicial inclination under such a clause to accord to municipal authorities wider discretion in the reasonable and nondiscriminatory exercise, in good faith, of the police power in the public interest. While under the clause, or under the guise of it, personal and property rights recognized by general law and guaranteed by organic provisions cannot unreasonably be restrained, courts uniformly regard the clause as ample authority for a reasonable exercise, in good faith, of broad and varied municipal activity to protect the

health, morals, peace and good order of the community, to promote its welfare in trade, commerce, industry, and manufacture, and to carry out every appropriate object contemplated in the creation of the municipal corporation. [Footnotes omitted.] [11]

This power is not to be construed necessarily in light of specifically delegated powers. In *City of Hobbs v. Biswell, supra,* the Court of Appeals of New Mexico upheld a city ordinance regulating pawnbrokers under a general welfare provision similar to Utah's. Compare N.M.Stat.Ann. § 14–16–1 (1953) with Utah Code Ann. § 10–8–84 (1953). In referring to the authority of a municipality under the general welfare provision, the court stated: "The ordinance adopting authority of subsection B, often referred to as a general welfare clause, is independent of and in addition to ordinance adopting authority conferred by specific statutes." [473 P.2d at 919.]

The Supreme Court of Pennsylvania adopted a similar position in *Adams v. City of New Kensington,* 357 Pa. 557, 55 A.2d 392 (1947). In that case, the plaintiff brought an action to enjoin enforcement of a city ordinance which required the licensing of music boxes, juke boxes, and mechanical vending machines on the ground that the city did not have the authority to pass the ordinance. [12] In upholding the ordinance, the court stated: "It is at once obvious that this provision constitutes a grant of extremely broad powers, and such 'gen-

---

**11.** 6 McQuillin, *Municipal Corporations* §§ 24.-43–.44 (3d rev'd ed. 1969).

**12.** The court referred to the statutory grant of authority as follows:
"In addition to the powers and authority vested in each city by the provisions of this act, [the council of each city shall have power] to make and adopt all such ordinances, \* \* \* not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the city \* \* \* and the maintenance of the peace, good government, safety and welfare of the city, \* \* \* and also all such ordinances \* \* \* as may be necessary in and to the exercise of the powers and authority of local self-governments in all municipal affairs; \* \*

and to enforce all ordinances inflicting penalties upon inhabitants or other persons for violations thereof, not exceeding three hundred dollars for any one offense, recoverable with costs, together with judgment of imprisonment, not exceeding ninety days, if the amount of said judgment and costs shall not be paid: Provided, however, That no ordinance \* \* \* shall be made or passed which contravenes or violates any of the provisions of the Constitution of the United States or of this Commonwealth, or of any act of Assembly heretofore or that may be hereafter passed and in force in said city." [*Id.,* 55 A.2d at 394, quoting the Third Class City Law of June 23, 1931, P.L. 932, sec. 2403, cl. 54.]

eral welfare clauses' have always been liberally construed to accord to municipalities a wide discretion in the exercise of the police power." [*Id.*, 55 A.2d at 395.]

Closely in point with the facts of the instant case is *Lehrhaupt v. Flynn*, 140 N.J. Super. 250, 356 A.2d 35 (1976), which dealt with the validity of a financial disclosure ordinance adopted by a township without express authority for such action. The court stated: "[A]lthough there is no specific statutory authorization for municipal enactment of official financial disclosure ordinances, general power to adopt such local legislation is inherent in the broad delegation of police power . . . ."

■ These cases state the rule which we adopt in this case. When the State has granted general welfare power to local governments, those governments have independent authority apart from, and in addition to, specific grants of authority to pass ordinances which are reasonably and appropriately related to the objectives of that power, i. e., providing for the public safety, health, morals, and welfare. *Salt Lake City v. Allred*, 20 Utah 2d 298, 437 P.2d 434 (1968). And the courts will not interfere with the legislative choice of the means selected unless it is arbitrary, or is directly prohibited by, or is inconsistent with the policy of, the state or federal laws or the constitution of this State or of the United States. Specific grants of authority may serve to limit the means available under the general welfare clause, for some limitation may be imposed on the exercise of power by directing the use of power in a particular manner. But specific grants should generally be construed with reasonable latitude in light of the broad language of the general welfare clause which may supplement the power found in a specific delegation.

Broad construction of the powers of counties and cities is consistent with the current needs of local governments. The Dillon Rule of strict construction is antithetical to effective and efficient local and state government. The complexities confronting local governments, and the degree to which the nature of those problems varies from county to county and city to city, has changed since the Dillon Rule was formulated. Several counties in this State, for example, currently confront large and serious problems caused by accelerated urban growth. The same problems however, are not so acute in many other counties. Some counties are experiencing, and others may soon be experiencing, explosive economic growth as the result of the development of natural resources. The problems that must be solved by these counties are to some extent unique to them. According a plain meaning to the legislative grant of general welfare power to local governmental units allows each local government to be responsive to the particular problems facing it.

Local power should not be paralyzed and critical problems should not remain unsolved while officials await a biennial session of the Legislature in the hope of obtaining passage of a special grant of authority. Furthermore, passage of legislation needed or appropriate for some counties may fail because of the press of other legislative business or the disinterest of legislators from other parts of the State whose constituencies experience other, and to them more pressing, problems. In granting cities and counties the power to enact ordinances to further the general welfare, the Legislature no doubt took such political realities into consideration.

■ We therefore hold that a county has the power to preserve the purity of its electoral process. The county was entitled to conclude that financial disclosure by candidates would directly serve the legitimate purpose of achieving the goal that special interests should not be able to exercise undue influence in local elections without their influence being brought to light.

■ It is further argued as support for the unconstitutionality of the statute that the State of Utah has preempted the entire matter of regulating elections. We do not agree. The argument is not based on any direct conflict between the ordinance and a

statute, for there is none. Rather, the argument rests upon the existence of state legislation requiring campaign disclosures by candidates running for certain state offices. But that legislation does not evidence an intention on the part of the Legislature to preempt local ordinances dealing with local candidates.[13] See *Thorpe v. Bamberger R. Co.*, 107 Utah 265, 153 P.2d 541 (1944); *Salt Lake City v. Kusse*, 97 Utah 113, 93 P.2d 671 (1938); *Battey v. Ritchie*, 73 Utah 320, 273 P. 969 (1928); *Salt Lake City v. Howe*, 37 Utah 170, 106 P. 705 (1910).

The state restrictions pertain only to contribution disclosure requirements for state candidates for the offices of governor, secretary of state, and attorney general, § 20–14–7. The State Corrupt Practices in Elections Act leaves county governments to determine for themselves whether the circumstances necessitate the imposition of campaign contribution disclosure requirements for city or county offices.

The subject of campaign disclosure requirements is not one that reflects a need for uniformity. With the differences in the nature of the counties in the State of Utah with respect to population, wealth, and other factors which have a relationship to the integrity of the electoral processes, it is reasonable, in the absence of state legislation, that each county should deal with the problem of the integrity of its electoral processes as it deems appropriate. The ordinances in this case do not conflict, directly or impliedly, with any state statute and are not for that reason unconstitutional.

In sum, the Dillon Rule of strict construction is not to be used to restrict the power of a county under a grant by the Legislature of general welfare power or prevent counties from using reasonable means to implement specific grants of authority. County ordinances are valid unless they conflict with superior law; do not rationally

promote the public health, safety, morals and welfare; or are preempted by state policy or otherwise attempt to regulate an area which by the nature of the subject matter itself requires uniform state regulation. Of course a specific power delegated to municipalities may imply a restriction upon the manner of exercise of that power, but the restriction on the exercise of such power is to be construed to permit a reasonable discretion and latitude in attaining the purpose to be achieved.

 Finally, contrary to defendant's contentions, a grant of general welfare authority to counties does not violate Article I, § 24, or Article XI, § 4 of the Utah Constitution. Article I, § 24 requires the uniform operation of general laws. The general welfare clause, § 17–5–77, applies uniformly to all counties. The fact that each county may exercise that power differently is of no constitutional moment. Indeed it would be impracticable, if not impossible, and a mockery of the concept of local self-government to require all counties to have the same ordinances as all others. Generally Article I, § 24 only requires uniformity of laws, within the jurisdiction in which they are operative. Finally, the constitutional mandate of Article XI, § 4, that the Legislature provide for a uniform system of county government, is not applicable because that provision was amended in 1973 to allow the Legislature to provide for optional forms of county government to be approved by referendum. That provision is not relevant to the instant problem. In any event, it is clear beyond peradventure that a uniform *system* of government does not require uniform laws within all the various systems of government.

We do not judge the wisdom, effectiveness, or practicality of the ordinance in question, or concern ourselves with the factual issues which underlie the allegations against defendant in this case. We rule

---

**13.** On the contrary, the Legislature negated an inference of an intent to exclusively occupy the field by repealing § 20–14–1 *et seq.*, U.C.A., as enacted in 1971 and reenacting in 1973 a revised Corrupt Practices in Elections Act, § 20–14–1 *et seq.*, U.C.A.

only that the ordinance under which this action is brought is constitutional.

The judgment of the lower court is reversed, and the case is remanded for a trial on the merits.

CROCKETT, C. J., and HALL, J., concur.

MAUGHAN, Justice (dissenting):

For the following reasons, I dissent. All statutory references are to Utah Code Annotated, 1953, as amended.

The analysis of the majority opinion utilizes the familiar technique of erecting a straw man, in this case, the abstract principle of law identified as Dillon's Rule, and throttling it with the evocative shibboleth of local control. The majority then interprets Section 17–5–77 as a carte blanche delegation of the state police power to local government, unless there be a specific and direct conflict between state and local law. This interpretation is inconsistent with the multiple statutes, wherein the legislature confers specific powers and duties on local government, and distorts the nature of the police power.

The State is the sole and exclusive repository of the police power, neither the federal nor local government has any such inherent power. The police power is awesome, for it confers the right to declare an act a crime and to deprive an individual of his liberty or property in order to protect or advance the public health, safety, morals, and welfare. The decision of whether a problem should be deemed one of local concern and should be regulated under the police power should initially be decided by the legislature representing all the citizens of this state. The legislature may then elect to delegate the power to local government to deal with the specific area of concern. It is equally a legislative judgment to deny delegating this power to local government.

The palliative suggested by the majority opinion that local citizens can change the law by electing new officials provides no relief for the individual previously convicted and avoids the basic issue of whether the police power has, in fact, been delegated under the specific circumstance. All exercise of the police power by local government is derivative, none is inherent, and it is the exclusive prerogative of the State to establish the conditions under which it will be exercised. If local government discerns a condition which merits control through the police power, this matter should be submitted to the legislature so that representatives of the entire state may resolve whether the problem should be addressed on a local level.

It is within the context of the foregoing principles that the specific delegation of the police power in Section 17–5–77 should be interpreted in this case.

There are two basic issues posed in this case, whether the County had the authority to enact these ordinances, (Sections 1–10–4, 1–10–8, Revised Ordinances of Salt Lake County) and whether the State had occupied the entire field of corrupt practices in elections, Chapter 14, Title 20 and Section 10–6–18, Utah Code Annotated, 1953. Both issues were argued on appeal.

Either issue standing alone, on the operative facts here, would be resolved against the County. Consequently, we direct our attention to each.

The District Court in a memorandum decision stated the County relied on Section 17–5–35, and particularly on Section 17–5–77, as its statutory grant of authority to pass the ordinances. The District Court observed, although this Court had not been completely consistent in every case on the issue, the majority of the cases had indicated grants of power to cities or counties were to be strictly construed to the exclusion of implied powers not reasonably necessary in carrying out the purposes of the expressed powers granted. The District Court expressed the opinion there was certainly no express authority enabling the enactment of the ordinances, and there was nothing implied from any express power that would justify the enactment of the ordinances.

The District Court stated it had considered *Salt Lake City v. Kusse*[1] and *Salt Lake City v. Allred*[2] cases relied on by the County, and it acknowledged there was certain language in these cases, which suggested a county had a fairly broad power to enact ordinances under the general welfare clause of Section 17–5–77. The District Court explained after considering those cases, it discerned a substantial difference in the authority of a city or county to regulate driving under the influence and prostitution under the wording of the general welfare clause of Section 17–5–77, and in being able to regulate campaign financing in county elections. The District Court concluded:

"... Given its broadest meaning, the Court fails to see how this type of conduct can be regulated under language enabling ordinances 'such as are necessary and proper to provide for the safety, and preserve the health, promote the prosperity, improve the morals, peace and good order, comfort and convenience of the county and the inhabitants thereof, ...' "

The ruling of the District Court was correct. The ordinances were ultra vires, and therefore void. There are no constitutional provisions conferring the police power concerning local matters on counties or non-chartered cities. These corporate political bodies have no inherent powers and none of the elements of sovereignty; they cannot go beyond the powers granted them and must exercise such powers in a reasonable manner.[3] The exercise of the police power is an attribute of state sovereignty, a portion of which it may delegate, but not to relinquish, to municipalities, which have none of the elements of sovereignty.[4] Section 17–4–1 provides the several counties of the state are bodies corporate and political, "and as such have the powers specified in this title and such other powers as are necessarily implied."[5]

The County advocates the view that the general welfare clause of Section 17–5–77 constitutes a broad, general grant of the state's police power to counties. This section is similar to Section 10–8–84, which grants the same powers to cities and has been interpreted by this court on a number of occasions. In *Lark v. Whitehead*[6] the city urged, under the general welfare clause, a municipal legislative body had a broad grant of power in criminal matters. It was also alleged the city was better qualified to determine what would adversely affect the safety, peace and good order of its inhabitants than was the state legislature. This Court responded:

"In *Nasfell v. Ogden City* (122 Utah 344, 346, 249 P.2d 507 (1952)) this court stated that it was committed to the principle that cities have none of the elements of sovereignty and that any fair, reasonable, substantial doubt concerning the existence of the power is resolved by the courts against the corporation (city) and the power denied; grants of power to cities are strictly construed to the exclusion of implied powers which are not reasonably necessary in carrying out the purposes of the express powers granted."[7]

In 2 McQuillin Municipal Corporations (1966 Rev.Vol.), Section 10.24, p. 801, it is stated:

"It has been said in some cases that municipal powers granted by a 'general welfare' clause in a charter or statute do

1. 97 Utah 113, 93 P.2d 671 (1939).

2. 20 Utah 2d 298, 437 P.2d 434 (1968).

3. *Bohn v. Salt Lake City*, 79 Utah 121, 8 P.2d 591 (1932).

4. *Salt Lake City v. International Association of Firefighters*, Utah, 563 P.2d 786 (1977).

5. See *Cottonwood City Electors v. Salt Lake County*, 28 Utah 2d 121, 499 P.2d 270 (1972).

6. 28 Utah 2d 343, 346, 502 P.2d 557 (1972).

7. Also see *Layton City v. Speth*, Utah, 578 P.2d 828 (1978); *Allgood v. Larsen*, Utah, 545 P.2d 530 (1976); *Parker v. Provo City Corporation*, Utah, 543 P.2d 769 (1975); *Johnson v. Sandy City Corporation*, 28 Utah 2d 22, 497 P.2d 644 (1972); *Stevenson v. Salt Lake City Corporation*, 7 Utah 2d 28, 317 P.2d 597 (1957).

not extend or enlarge powers specifically granted, . . . "[8]

The instant case is distinguishable from others, on which the County relies, insofar as in the others the municipal government did not rely solely and exclusively for its authority on the general welfare grant but cited and relied on other express statutory grants of authority which dealt generally with the subject matter of the challenged ordinances.

In *Salt Lake City v. Kusse*,[9] the City relied on both its authority to regulate traffic and the general welfare clause, as the basis to sustain an ordinance which prohibited driving while under the influence of intoxicating liquor. This Court stated there might be some question as to whether the authority to regulate traffic permitted enactment of the ordinance. However, the general welfare clause definitely permitted the city to pass such an ordinance. It further said the prohibition of such person's propelling or driving a car was definitely and closely related to the safety of the inhabitants and the preservation of property. This Court distinguished the case of *Salt Lake City v. Sutter*,[10] wherein there was no statutory authority for a city to prohibit possession of intoxicating liquors. It said:

". . . There was power to pass an ordinance to prevent the sale, disposition, and manufacture of intoxicating liquors; but as there said the power to prohibit possession could not be inferred from the power to prohibit sale because it was not necessary to accomplish such prohibition nor was it fairly implied as an incident of such power."

In *Salt Lake City v. Allred*[11] the authority of the city to enact an ordinance making it a crime for one to direct any person to any place for the purpose of committing an act of sexual intercourse for hire was challenged. The city cited three statutory

sources for its authority, the general welfare clause, the power to suppress houses of prostitution (Section 10–8–41) and to punish prostitutes (Section 10–8–51). This Court did not determine whether the authority conferred under the general welfare clause was sufficient, since it ruled the State, by enacting comprehensive and complete laws pertaining to sexual offenses had pre-empted that field. Upon rehearing the case [12] this Court completely reversed the prior decision. This Court accepted the contention of the city, viz., the general welfare clause conferred authority to enact the ordinance. The rationale of the case was, it is a proper exercise of the police power to protect the public morals, and the challenged ordinance appeared to bear a reasonable relationship to the preservation and protection of public morals.

In a thoughtful case note in the 1968 Utah Law Review 419, *State Preemption and the Exercise of Municipal General Welfare Powers: A City's Anti-Prostitution Ordinance*, the author states apparently conflicting cases can be reconciled by a test suggested in some of the cases concerning the validity of an enactment under the general welfare clause:

". . . Whether an ordinance is reasonably and substantially related to the protection of the public interest in health, safety, or morals."

The author explains this Court's decisions appear compatible with a reasonable relationship standard, since only those ordinances immediately affecting general welfare interests have been upheld.

". . . Driving under the influence of alcohol, for example, is a greater threat to public safety than merely possessing alcohol without authorization; maintaining rendezvous for prostitutes and their clients is more injurious to public morals than keeping pin ball machines or playing

8. *Lark v. Whitehead*, note 6, supra, is cited in the supplement as supporting this principle.

9. Note 1 supra.

10. 61 Utah 533, 216 P. 234 (1923).

11. 19 Utah 2d 254, 430 P.2d 371 (1967).

12. 20 Utah 2d 298, 437 P.2d 434 (1968).

pool. When the state legislature authorizes municipalities to prohibit the sale of alcohol, the maintenance of a place to sell alcohol is more clearly antagonistic to the state-sanctioned policy than unlawful possession of alcohol." [13]

Section 17–5–77, provides:

"The board of county commissioners may pass all ordinances and rules and make all regulations, not repugnant to law, necessary for carrying into effect or discharging the powers and duties conferred by this title, and such as are necessary and proper to provide for the safety, and preserve the health, promote the prosperity, improve the morals, peace and good order, comfort and convenience of the county and the inhabitants thereof, and for the protection of property therein; ..."

The issue is thus reduced to the question of whether the challenged ordinances are *substantially and reasonably* related to the promotion of the prosperity and improvement of the morals, peace and good order, comfort and convenience of the county and its inhabitants. The circumstances of this case compel a negative answer; there is neither a substantial nor reasonable relationship between the aforecited purposes and the campaign disclosures of elected county officials. This matter is best illustrated by three cases: *Bohn v. Salt Lake City*,[14] *Salt Lake City v. Revene*,[15] and *Nance v. Mayflower Tavern, Inc.*[16]

In *Bohn* the issue concerned the authority of the city to include certain special provisions in a contract to construct storm sewers. These provisions were included solely for the purpose of alleviating the unemployment situation, which this Court described as a wholly collateral condition to the objects and purposes sought by the construction of storm sewers. This Court began its analysis by citing the principles that implied and incidental powers include those necessary to give effect to powers expressly granted, and the "General Welfare Clause" neither enlarges nor annuls the powers conferred upon the city by special grant.

This Court particularly concentrated on the provision in the contract concerning minimum wage. The power to fix a minimum wage and to prescribe the hours which constitute a day's labor are generally regarded as an exercise of the police power. The Court explained the police power was inherent in the state, while a municipal corporation has no inherent power to enact police regulations. Such corporation derives its powers solely from the legislature and can exercise only such police power as is fairly included in the grant of its powers. The Court distinguished decisions from other jurisdictions where the charter powers of municipalities are far more comprehensive than is the case in this state.

"There is in this state no express or implied power conferred upon a municipality which directly or by implication authorizes a city to dictate to a contractor the wages that he shall pay his employees.... In this jurisdiction, inasmuch as municipalities have none of the elements of sovereignty in exerting their given powers, we think the provision in the proposed contracts with respect to the minimum wage must be ruled out." [17]

In the *Revene* case, the city urged, an ordinance, setting the closing hours of barbershops, was a valid exercise of the police power delegated by the Legislature to the city to regulate for the safety and preservation of health in the community. This Court characterized the issue as whether the fixing of the closing hours was a reasonable regulation within the scope of the *delegated* police power, i. e., did it have a

13. at p. 422 of 1968 U.L.R.

14. 79 Utah 121, 8 P.2d 591 (1932).

15. 101 Utah 504, 124 P.2d 537 (1942).

16. 106 Utah 517, 150 P.2d 773 (1944).

17. at p. 131 of 79 Utah, 8 P.2d 591.

reasonable relationship to the protection of the health of the public.

The Court observed, if the purpose of the ordinance were to limit the working hours of the operators, the method was too indirect and accomplished far wider results than mere limitation of working hours. The Court further examined the cases from other jurisdictions and observed, in all of those cases concerning the fixing of hours of business of barbershops, all of the courts had held there was no reasonable relationship to the protection of the public.

The opinion then recited and relied on the principle that any fair, reasonable, substantial doubt concerning the existence of the power is resolved by the courts against the corporation, and the power denied. The ruling was:

"We find that the municipality was not delegated the authority to control the closing hours of barbershops, either under its general police power given by Section 15–8–84, and 15–8–61, or under the power to regulate certain named businesses. In the absence of a specific legislative enactment so providing for the municipality to act, we are of the opinion the ordinance requiring the closing of barbershops is an invalid exercise of the police power." [18]

In the *Nance* case the challenged ordinance provided for civil rights concerning restaurants. The Court said cities had no inherent or original legislative power. The power to enact an ordinance is determined by the legislative grant of power and the Constitution of Utah. If there be a reasonable doubt concerning the existence of a particular power, the doubt is resolved against the city, and the power is denied. The Court held:

"... The power to enact civil rights legislation is not granted in express words either by constitution or by statute, nor is it necessarily or fairly implied in or incident to the powers expressly granted. Likewise it cannot be held to be essential to the accomplishment of the

declared objects and purposes of the corporation, or as Dillon states, 'indispensable' to the accomplishment of the declared objects. We therefore hold that cities have no power to enact such civil rights legislation...."

In the matter at hand, there is no express grant conferring authority on Salt Lake County to enact a corrupt practices act concerning local elected officials. Such authority cannot be implied from the general welfare clause of Section 17–5–77 since it does not have a sufficiently direct, substantial, immediate effect on the specific general welfare interests set forth therein.

With regard to the issue of preemption, a critique in a 1968 Utah Law Review 419 (cited and discussed ante) is illuminating. With it we begin our analysis of that issue.

"The direct conflict standard, however, is not soundly grounded insofar as it was extrapolated from a jurisdiction in which the state constitution granted municipalities all residual powers to enact ordinances not in conflict with state law. In contrast to this jurisdiction, Utah's unchartered municipalities have no power independent of express grants made by the legislature. Therefore, a municipality could logically be prohibited from enacting an ordinance by a state statute evidencing an intent to restrict municipal legislation, although the statute's language or plain meaning did not directly conflict with the ordinance. A more tenable approach for the court in the second opinion [*Salt Lake City v. Allred*, note 12, supra] would have been to expressly reject reliance on the direct conflict standard and expressly hold that preemption occurs when either direct conflict is apparent or the state legislature, through comprehensive statutory enactments, occupies the field.

"Preemption by occupation has been widely adopted in other jurisdictions and is consistent with the Utah court's restricted view of municipal powers...." [19]

The author concluded:

---

**18.** p. 511 of 101 Utah, 124 P.2d 537.

**19.** 1968 U.L.R. 424.

"In its treatment of preemption, the court should have expressly recognized the preemption-by-occupation doctrine and evaluated the state's policy, statutory scheme, and interest in uniformity to resolve the preemption issue. Absent such an approach, only those ordinances directly in conflict with either the language or plain meaning of the statutes are clearly preempted." [20]

In 6 McQuillin Municipal Corporations (1969 Rev.Vol.), Section 21.34, pp. 268–270, it is stated:

"A matter may be of state concern to an extent that it calls for statewide treatment and is beyond the control of a municipality. In such a case, a state law may lawfully occupy a particular field of legislation so that there is no room for local regulation. Indeed, statutes supersede or prevail over even nonconflicting ordinances in some instances, as where the matter calls for exclusive regulation by virtue of legislative intention expressed or necessarily implied; and the implication may arise from the nature of the subject regulated. In other words, a municipal ordinance cannot prevail over or supersede a statute, and the ordinance is invalid, where the ordinance and statute relate to a matter that is fully, exclusively and validly covered by the statute. "... In all events, 'whether the legislature has undertaken to occupy exclusively a given field of legislation is to be determined in every case upon an analysis of the statute, and of the facts and circumstances upon which it was intended to operate.' Stated otherwise, in determining whether the legislature intended to occupy a particular field to the exclusion of all local regulation, the court may look to the whole purpose and scope of the legislative scheme and is not required to find such an intent solely in the language used in the statute." [21]

In *Overlook Terrace Management Corp. v. Rent Control Board*,[22] the Court explained preemption was a judicially created principle based on the proposition a municipality, which is an agent of the State, cannot act contrary to the State. In a preemption analysis there must be an initial determination as to whether the field or subject matter in which the ordinance operates, including its effects, is the same in which the State has acted. If the answer be in the affirmative, then the following questions are pertinent to the determination of the applicability of preemption:

1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)? [Citations]

2. Was the law intended, expressly or impliedly, to be exclusive in the field? [Citations]

3. Does the subject matter reflect a need for uniformity? ...

4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? [Citations]

5. Does the ordinance stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives' of the Legislature? [Citation]

The principle of preemption by occupation is based on sound reasons. It is both logical and necessary that an ordinance may be found to conflict with a statute by reason that it is contrary to a state policy established by the Legislature.

The first enactment by the Legislature requiring a candidate to make a sworn statement of all his election and campaign

---

20. 1968 U.L.R. 428.

21. *Lancaster v. Municipal Court for Beverly Hills*, 6 Cal.3d 805, 100 Cal.Rptr. 609, 494 P.2d 681, 682 (1972); *Galvan v. Superior Court*, 70 Cal.2d 851, 76 Cal.Rptr. 642, 452 P.2d 930, 935–940 (1969); *In re Hubbard*, 62 Cal.2d 119, 41 Cal.Rptr. 393, 396 P.2d 809, 812–815 (1964);

*In re Lane*, 58 Cal.2d 99, 22 Cal.Rptr. 857, 372 P.2d 897, 899–900 (1962); *Lamb v. Mirin*, 90 Nev. 329, 526 P.2d 80, 82 (1974); *Summer v. Township of Teaneck*, 53 N.J. 548, 251 A.2d 761, 764–765 (1969).

22. 71 N.J. 451, 366 A.2d 321, 326 (1976).

expenses and by whom such funds were contributed was in 1911, Laws of Utah, Chapter 125, Section 213. This requirement applied only to elective officers of cities of the first and second class. A substantially similar statute is in effect today in Section 10–6–18, U.C.A., 1953. In 1917, the Legislature passed an act for the prevention and punishment of corrupt practices in elections, Laws of Utah 1917, Chapter 92.

Under Section 1(2) of this act the term "candidate" meant and included every person for whom it was contemplated or desired that votes be cast at any political convention, primary or election, and who tacitly or expressly consented to be so considered, except candidates for president and vice-president of the United States. Under Section 9 of the act, every candidate was required to make a detailed disclosure of all receipts and disbursements.

In *Sjostrom v. Bishop*[23] this Court ruled the apparent objective of both of the aforecited enactments was to safeguard against corrupt practices in elections by requiring elected officials to disclose the sources and expenditures of funds.

In 1973, Laws of Utah, Chapter 31, the definition of a candidate and the reporting requirements concerning contributions and expenditures were confined to the governor, secretary of state, and attorney general. [See Sections 20–14–1(2) and 20–14–7.] However, there remains a series of broad and comprehensive enactments in Section 20–14–24 through Section 20–14–47 to prohibit corrupt practices in elections and providing punishment for any violation. The legislation over a period of many years indicates a legislative intent to insure on a statewide basis the purity of the electives process by prohibiting corrupt practices. The means to accomplish this objective is subject to legislative discretion so long as it does not violate any constitutional provision. From 1917 until 1973, one of the means to accomplish the legislative objective was the requirement for all candidates to report their contributions and disbursements.

In 1973, the legislature appeared, in its wisdom, to determine either that reporting by all candidates was not a particularly efficacious means to prevent corruption or was an undue burden on candidates, other than those for the principal state offices, and the other enactments would still prohibit the egregious acts of corruption. From a review of the history of the nature of the comprehensive legislative enactments there emerges a clear legislative intent to occupy the entire field of corrupt practices in the elective process. This is, at once, more logical and consistent with the facts.

A reporting requirement concerning some local governments was retained (10–6–18), which inferentially supports the concept that reporting in other units of local government was rejected. Additionally, there was no legislation which expressly or impliedly authorized any units of local government to enact regulations concerning corrupt practices in the legislative process.

From the foregoing, the conclusion is compelling the Salt Lake County ordinances are in conflict with the state policy to control corrupt practices in the elective process, and to determine exclusively the means to accomplish this objective.

There is one other aspect which merits consideration, i. e., the total inconsistency in the position of the majority opinion concerning the authority of the County Attorney to prosecute this appeal and the action of this Court in *State v. Loddy*, Utah, 618 P.2d 60 (1980). Particularly in this case, where there is a serious issue of whether a complex statutory scheme regulating corrupt practices in elections has preempted local regulations, the Attorney General should have prosecuted this appeal. The County Attorney's interest and approach are directed to sustaining the validity of the ordinance, a provincial position which may be completely antagonistic to the interests of the people of this state. The majority further attenuates the jealously-guarded legislative prerogative to delegate the police power to local government. The conse-

**23.** 15 Utah 2d 373, 376, 393 P.2d 472 (1964).

quences of the opinion in this case are of such a magnitude that the people are entitled to have the issues briefed and argued by their statutory legal representative, the Attorney General.

WILKINS, Justice (dissenting):

I concur in the dissenting opinion of Mr. Justice MAUGHAN on the first issue he addresses, namely, that Salt Lake County lacks authority to enact the ordinances in question.